MANSFIELD, Justice.
This appeal from an adjudication of delinquency requires us to determine whether a violation of the Confrontation Clause occurred when the juvenile court admitted out-of-court statements of a four-year-old child victim. The child made some of the statements during a medical assessment performed by a physician; others were made in the course of a recorded interview conducted by a forensic interviewer. Both the physician and the interviewer testified at the hearing.
. Applying recent authority,of the United States Supreme Court, we find that admission of the physician’s testimony and report did not violate the Confrontation Clause. We also conclude that any error in admission of the forensic interviewer’s testimony was harmless beyond a reasonable doubt in light of other overwhelming evidence that the respondent committed the charged conduct. For these reasons, we affirm the judgment of the juvenile court and the decision of the court of appeals.
I. Facts and Procedural Background. ■
On July 2, 2013, twelve-year-old J.C. visited the home of his friend K.W. An extended family lived in the home, including • K.W.’s sister E.W., K.W,’s brother I.W., and their four-year-old niece A.W.
That afternoon a number of the children were playing outside. J.C. tried to take pictures with a cellphone of E.W.’s chest and tried to touch her. J.C. also attempted to show photos of his penis to E.W. On a previous occasion, J.C.' had written a note to E.W. asking to have sex.
After dinner, I.W. walked into an upstairs bedroom unannounced. He saw J.C. pulling down A.W.’s underwear and saying, “It’s time to go to sleep.” A.W. was *450 lying on her back; J.C. was on his knees over her. The underwear was halfway pulled down when I.W. arrived. I.W. yelled at J.C. and pulled him off.of A.W. J.C. denied that anything was going on, turned red, and ran out of the house.
Meanwhile, E.W. and her friend M.M. had been downstairs. M.M. heard A.W. scream. She and E.W. ran upstairs and entered the bedroom. I.W. was already in the room. According to M.M., J.C. had A.W. pinned on the bed and was on top of her. J.C. was taking off AW.’s, clothing, and AW.’s shirt was already on the floor. J.C. soon left the house.
E.W. also recalled hearing commotion and going upstairs with M.M. She arrived to see J.C. on the bed with A.W. and his arm on her. To E.W.’s recollection, A.W. was still dressed.
The two older girls — E.W. and M.M.— grabbed A.W. and brought her downstairs to her mother who was doing chores at the time. The mother called the police and filed a report. The police later directed AW.’s parents to the Child Protection Response Center for interviewing.
The police also obtained KW.’s cellphone, which J.C. had been using that day. The cellphone was found tp contain photos of J.C.’s penis, a video of J.C. masturbating, and a video taken by J.C. of K.W. with J.C.’s voiceover stating that K.W. was going to suck his penis that evening. ,
A.W. does not speak very clearly. A.W. is in speech therapy and, according to AW.’s mother, talking to her is like talking to a two-year-old.
On July 10, A.W. was brought to the Child Protection Response Center by her parents. At that time A.W. was interviewed by Michele Mattox — a forensic interviewer with the Child Protection Response Center and a former twenty-five-year employee of the Iowa Department of Human Services. Mattox had a referral sheet that said, “Rule out sex abuse by older child_” The interview was recorded on DVD, and Mattox .also prepared a report. Mattox recalled that A.W. “had a definite speech and language problem and delay.” In the interview, A.W. said that J.C. had touched her “pee” and that her clothes were off and J.G.’s were on. Law enforcement observed the interview.[1] ■
Additionally, Dr. Barbara Harre, a physician and the medical director of the Child Protection Response Center, saw A.W. on July 31. Her meeting was not Recorded, but she dictated a report. Dr. Harre’s report explainéd, “I was asked to complete a medical assessment for [A.W.] ” AW.’s father brought her to the appointment, but Dr. Harre spoke to A.W. alone. No one from law enforcement was present. Dr. Harre took notes and then prepared a report addressed to the assistant county attorney who later prosecuted the case.
Dr. Harre initially reviewed truth-lie concepts and conducted a medical review of AW.’s systems for any areas of discomfort or signs of illness. Dr. Harre then asked A.W. if she could remember what had happened with her brother’s friend when he was' at her place. A.W. stated, “Me upstairs. 'Polled underpants off.” Dr. Harre asked if her underpants came all the way off or down to her knees or something else. A.W. stated, “To knees.” In response to a question whether she had been touched, A.W. said, “Touched me boob. One. Two.” While saying this, A.W. pointed to both sides of her chest.
Dr. Harre asked if the brother’s friend touched her anywhere else. A.W. stated, “Touched back bottom,” while pointing to *451 her rear. . Dr. Harre. asked again if he touched anywhere else. A.W. stated, “Touched front bottom.” Dr. Harre asked A.W. what he touched her body with, and A.W. said “Wawa,” apparently a reference to a dinosaur toy she used to have. Dr. Harre asked if the touching hurt or felt good or tickled or something else. A.W. said, “Hurt.” Dr. Harre asked A.W. if anybody else had ever touched her in a way that made her uncomfortable or hurt or something else. A.W. said, “No one else.”
After Dr. Harre. finished asking these questions, she conducted a full medical exam of A.W., with her father now present at A.W.’s request. Dr. Harre found nothing abnormal in the physical exam. When asked during the me&cal exam to indicate where she had been touched, A.W. pointed to her front bottom area and her anal area. According to Dr. Harre, it was “moderately” difficult to understand A.W. throughout the interview and exam. Dr. Harre had not received any information concerning Mattox’s interview before she saw A.W.
The State fiied a delinquency petition and the case proceeded to hearing. A.W.’s mother testified that A.W. would be traumatized by testifying and might not even be able to speak. A psychologist, Catherine Jackson, also testified that the trauma to‘a child of this age would outweigh any benefit from the testimony. The State did not call A.W. to testify. However, other witnesses for the State included I.W., E.W., M.M., Mattoxj and Dr. Harre. J.C. testified on his own behalf and denied assaulting A.W.
J.C. objected to testimony from Mattox and Dr. Harre describing A.W.’s statements on the 'basis of hearsay and the Confrontation Clause.[2] J.C. also objected to the admission of their written reports and the DVD of Mattox’s interview. with J.C.
The juvenile court sustained the objections to Mattox’s written report and the DVD. The court admitted Dr. Harre’s written report. The court also permitted both Dr. Harre and Mattox to testify regarding their interviews of A.W. The court found beyond a reasonable doubt that J.C. committed assault with intent to commit sexual abuse in violation of Iowa Code section 709.11 (2013) and adjudicated J.C. a delinquent child as defined by section 232.2(12).
The court noted that J.C.’s testimony “is inconsistent with A.W.[’s] statements to Dr. Harre, and eyewitness accounts by I.W., E.W., M.M., and K.W. who saw A.W. and [J.C.] together. The eyewitness accounts alone are quite persuasive in this case and appear credible due to the differences which are explained by the order they entered the room,”
J.C. appealed. He argued that the court erred in admitting certain testimony due to insufficient notice of the witness. He also urged that the court should have excluded any evidence of A.W.’s statements to Dr. Harre and Mattox as violating the Confrontation Clause. Lastly, he argued that evidence of AiW.’s out-of-court statements to Dr. Harre and Mattox should not have been admitted because A.W. was incompetent to testify.
We transferred the ease to the court of appeals. The court of appeals affirmed, with one judge on the panel' dissenting. J.C. filed ah application for further review, which we granted^
II. Standard of Review.
“We review constitutional questions de novo”’ Clarke Cty. Reservoir *452 Comm’n v. Robins, 862 N.W.2d 166, 171 (Iowa 2015). Our review of evidentiary claims is for abuse of discretion. State v. Harrington, 800 N.W.2d 46, 48 (Iowa 2011).
III. Analysis.
On further review, we have discretion to let the court of appeals decision stand as the final decision on an issue. See State v. Walker, 856 N.W.2d 179, 184 (Iowa 2014). We do so here with respect to the inadequate notice argument and turn to the remaining issues.
A. Confrontation Clause — Dr. Harre. Both the Sixth Amendment of the United States Constitution and article I, section 10 of the Iowa Constitution preserve an accused’s right “to be confronted with the witnesses against him.” This right of confrontation applies to juvenile delinquency proceedings. In re Gault, 387 U.S. 1, 56, 87 S.Ct. 1428, 1459, 18 L.Ed.2d 527, 562 (1967). Even though J.C.’s appellate brief refers to both the Sixth Amendment and article I, section 10 of the Iowa Constitution, he has not argued for a particular test or standard under the Iowa Constitution. In fact, he has only cited caselaw decided under the United States Constitution. We will therefore follow the approach we took in State v. Kennedy:
“[W]e jealously protect this court’s authority to follow an independent approach under our state constitution” for provisions of the Iowa Constitution that are the same or nearly identical to provisions in the United States Constitution. However, in his appellate brief, [the appellant] does not propose a specific test we should apply under article I, section 10 of the Iowa Constitution. Rather he only cites caselaw analyzing the Confrontation Clause under the United States Constitution. Thus, under the facts of this case, we choose not to interpret the Iowa Constitution any differently from the United States Constitution.
846 N.W.2d 517, 522 (Iowa 2014) (first alteration in original) (citation omitted) (quoting State v. Pals, 805 N.W.2d 767, 771 (Iowa 2011)).
Under the Sixth Amendment, the fundamental question we must answer is whether the out-of-court statements were testimonial in nature. See State v. Bentley, 739 N.W.2d 296, 298 (Iowa 2007). “If the statements are testimonial, they are inadmissible against [the defendant] at trial; but if they are nontestimonial, the Confrontation Clause does not prevent their admission.” Id. The burden is on the State to prove by a preponderance of the evidence that a challenged statement is nontestimonial. State v. Schaer, 757 N.W.2d 630, 635 (Iowa 2008).
In our determination of what constitutes testimonial evidence, the United States Supreme Court’s decision in Crawford v. Washington provides direction. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). As we have said concerning that decision,
[T]he Court indicated that, at a minimum, there were four types of evidence that met the definition of testimonial: grand jury testimony, preliminary hearing testimony, former tidal testimony, and statements resulting from police interrogations. These are the types of evidence with the “closest kinship” to historical “abuses at which the Confrontation Clause was directed.”
In addition to these four categories of evidence, the Supreme Court provided three “formulations” to aid courts in determining whether other types of statements are testimonial. The first formulation involved ex parte in-court testimony or its functional equivalent where the declarant would reasonably expect the statements to be used at *453 trial and where the defendant was unable to- cross-examine the declarant. The second formulation involved formalized testimonial materials such as confessions and depositions. The third and most open-ended formulation included statements made under circumstances that would lead witnesses to objectively believe the statements might be used at trial.
State v. Shipley, 757 N.W.2d 228, 235 (Iowa 2008) (citations omitted) (quoting Crawford, 541 U.S. at 51-52, 68, 124 S.Ct. at 1364, 1374, 158 L.Ed.2d at 193, 203).
Our decision in Bentley involved the admissibility of an interview with a ten-year-old girl. 739 N.W.2d at 297. The interview was conducted by a counselor at a child protection center but was arranged by police and DHS personnel and monitored by them through an observation window. Id. During the interview, the girl made numerous statements alleging the defendant had sexually abused her. Id.
We determined in Bentley that use of the interview violated the defendant’s Confrontation Clause rights under the Sixth Amendment. Id. at 302-03. After carefully reviewing the facts and circumstances, we found that “[t]he extensive involvement of a police officer in the interview leads us to , conclude [the girl’s] statements were in effect ‘taken by [a] police officer[J in the course of [an] interrogation[ ].’” Id. at 299 (last four alterations in original) (quoting Crawford, 541 U.S. at 52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193). Among other things, we emphasized the “close, ongoing relationship” between local law enforcement and the child protection center; the participants’ acknowledgment that the interview “served an investigative function for the' State”; the disclosure to the girl at the beginning of the interview that police and DHS were listening through the observation window accompanied by the interviewer’s explanation that “it’s just really important the police know about everything that happened”; and the interviewer’s mid-interview consultation with the police and DHS representatives to obtain more questions. Id. at 299-300.
Since Bentley, we have determined in two cases that statements to medical personnel were not testimonial. In Schaer, the victim spoke to treating medical personnel in an emergency room before police arrived, identifying the defendant as her attacker. 757 N.W.2d at 632. We noted that the statements “were not solemn declarations made for the purpose of proving some fact” or- “made under circumstances that would lead an objective person to reasonably believe the statements would be available for use at a later trial.” Id. at 636. The interview “lack[ed] the indicia of formality” evident in Bentley, and there was “no indication in the record of any relationship between the emergency room personnel and law enforcement authorities that would support a finding the medical providers’ questioning of [the Victim] as to the cause of her injuries was ‘a substitute for police interrogation at the station house.’ ” Id. at 637 (quoting Bentley, 739 N.W.2d at 299).’
Likewise, in State v. Harper, we held that a victim’s statements to hospital staff that the defendant had raped her, tied her, and set her house on fire were nontestimonial. 770 N.W.2d 316, 322 (Iowa 2009). A doctor had asked the badly burned victim what had happened to her and the victim responded. Id. at 323. “The primary purpose of the statements was to assist the physicians in treating her.” Id.
The question we confront today is whether the statements of a four-year-old to (1) the medical director of the Child Protection Response Center and (2) a forensic interviewer employed by the same *454 organization were testimonial. The statements were made on different visits that occurred on different dates. Law enforcement observed the forensic interview but not the interview conducted by the medical director. It is clear that the police arranged the forensic -interview, -but less clear how the subsequent meeting with the medical director came about.[3]
For additional guidance we turn to the United States Supreme Court’s recent decision in Ohio v. Clark, 576 U.S.-, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015). Because of its recent vintage, we have not previously considered or discussed this case. In addition, the court of appeals did not have' the benefit of Clark when it rendered its decision in this case.
In Clark, the defendant was alleged to have physically abused his girlfriend’s two young children, one of whom was a three-year-old boy, L.P. Id. at ——, 135 S.Ct. at 2177-78, 192 L.Ed.2d at 312. The boy was found not competent to testify, but his statements to two teachers identifying the defendant as the person who had caused his injuries were admitted by the trial court. Id. at -, 135 S.Ct. at 2178, 192 L.Ed.2d at 312-13.
On appeal, both the Ohio Court of Appeals and the Ohio Supreme Court found that the admission of the young boy’s statements to his teachers violated the Confrontation Clause. Id. at -, 135 S.Ct. at 2178, 192 L.Ed.2d at 313. Noting that the teachers were under a legal obligation to report child abuse to government authorities, the Ohio Supreme Court found that the statements qualified as testimonial because the primary purpose of -the teachers’ questioning “was not to deal with an existing emergency but rather to gather evidence potentially relevant to a subsequent criminal prosecution.” Id. The United States Supreme Court reversed and found no violation. Id. at -, 135 S.Ct. at 2179, 2181, 192 L.Ed.2d at 313, 315.[4]
The Court’s opinion first summarized the Court’s Confrontation Clause precedents, including Crawford, which announced and expounded on the primary-purpose test. Id, at -, 135 S.Ct. at 2179-81, 192 L.Ed.2d at 313-15. The Court then went on,
Thus, under our precedents, a statement cannot,fall within the Confrontation Clause unless its primary purpose was testimonial. “Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.” But that does not mean that the Confrontation Clause bars every statement that satisfies the “primary purpose” test. We have recognized that the Confrontation Clause does not prohibit the introduction of out-of-court statements that would have been admissible in a criminal case at the time of the founding. Thus, the primary pur *455 pose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause.
Id. at -, 135 S.Ct. at 2180-81, 192 L.Ed.2d at 315 (citations omitted) (quoting Michigan v. Bryant, 562 U.S. 344, 359, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93, 107-08 (2011)). In short, the Court made clear that out-of-court statements could fail the primary-purpose test and still be admissible notwithstanding the Confrontation Clause.
Applying these principles to Clark’s prosecution, the Supreme Court majority first examined the primary-purpose test. It found that the boy’s statements “clearly were not made with the primary purpose of creating evidence for Clark’s prosecution.” Id. at - , 135 S.Ct. at 2181, 192 L.Ed.2d at 315. Rather, as the Court explained,
• L.P. statements occurred in the context of an ongoing emergency involving suspected child, abuse. When L.P.’s teachers noticed his injuries, they rightly became worried that the 3-year-old was the victim of serious violence. Because the teachers needed to know whether it was safe to release L.P. to his guardian at the end of the- day, they needed to determine who might be abusing the, child. Thus, the immediate concern was to protect a, vulnerable child who needed help.
Id. at -, 135 S.Ct. at 2181, 192 L.Ed.2d at 315-16 (footnote omitted).. The Court went on,
There is no indication that the' primary purpose of the conversation, was to gather evidence for Clark’s prosecution. On the contrary, it is clear'that the first objective was to protect L.P.’At no point did the teachers inform L.P. that his answers would be used to arrest or punish his abuser. L.P. never hinted that he intended his statements to be used by the police or prosecutors. And the conversation between L.P. and his teachers was informal and spontaneous. The teachers asked L.P. about his injuries immediately upon discovering them, in the informal setting of a preschool lunchroom and classroom, and they did so precisely. as any concerned citizen would talk to a child who might be the victim of abuse. , .
Id. at -, 135 S.Ct at 2181, 192 L.Ed.2d at 316.
Yet the Court did not leave the analysis there. The Court stated that “L.P.’s age fortifies our conclusion that the statements in question were not testimonial. Statements by very young children will rarely, if ever, implicate the Confrontation Clause.” Id. at -, 135 S.Ct. at 2181-82, 192 L.Ed.2d at 316. The Court. commented that “it is extremely unlikely that a 3-year-old child in L.P.’s position would intend his statements to be a substitute for trial testimony.” Id. at -, 135 S.Ct. at 2182, 192 L.Ed.2d at 316. Additionally, the Court emphasized that in the eighteenth century, out-of-court statements by children who were incompetent to testify due to their youth were regularly, admitted in criminal cases. Id. at-, 135 S.Ct. at 2182, 192 L.Ed.2d at 316-17. Therefore, in the Court’s view, “It is .... highly doubtful that statements like L.P.’s ever would have been understood to raise Confrontation Clause concerns.” Id. at-, 135 S.Ct. at 2182, 192 L.Ed.2d at 317. Also, the Court reiterated that the statements were made to teachers, not law enforcement officials: -
Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. It is common sense that the *456 relationship between a student and his teacher is very different from that between a citizen and the police. -
Id. (citation omitted). The' Court concluded, “In light of these circumstances, the Sixth Amendment did not prohibit - the State from introducing L.P.’s statements at trial.” Id.
Based on the Supreme Court’s opinion in Clark, we do not believe admission of Dr. Harre’s testimony and report violated J.C.’s rights of confrontation under the Sixth Amendment. Several points must be noted. A.W. is a very young child, and the Supreme Court said in Clark that “[statements by very young children will rarely, if ever, implicate the. Confrontation Clause.”, Id. at -, 135 S.Ct. at 2182, 192 L.Ed.2d at 316. The Court supported this statement with historical evidence including an approving citation to a law review article. Id. at -, 135 S.Ct. at 2182, 192 L.Ed.2d at 316-17 (citing Thomas D. Lyon & Raymond LaMagna, The History of Children’s Hearsay: From Old Bailey to Post-Davis, 82 Tnd. L.J. 1029 (2007) [hereinafter Lyon]). The article-makes clear that in eighteenth century Britain, “the hearsay of unavailable child witnesses was routinely admitted.” Lyon, 82 Ind. L.J. at 1030. Thus, A.W.’s age alone may settle . the Sixth Amendment inquiry.[5]
Also, A.W.’s statements were made to a physician, with no law enforcement representative in. the room or even observing *457 the encounter remotely. 'In Clark, the Supreme Court stressed “that- the relationship between a student and teacher is very different from-that between a citizen and the police.” Id, at -, 135 S.Ct. at 2182, 192 L.Ed.2d at 317. The same is true of the relationship between a small child and physician. .
Under a pure primary-purpose test, the issue would undoubtedly be closer — certainly closet than Clark[6] Yet even here a number of factors weigh against a Confrontation Clause violation. The primary-purpose test asks whether the main purpose of the conversation was" to “creat[e] an out-of-court substitute for trial testimony.”" Id. at —, 135 S.Ct. at 2180, 192 L.Ed.2d at 315 (alteration in original) (quoting Bryant, 562 U.S. at 358, 131 S.Ct. at 1155, 179 L.Ed.2d at 107). At the outset, we need to ask, “Whose primary purpose?” A.W.’s or Dr. Harre’s? - The Court applied the primary-purpose test by considering the matter.from the perspective of both interviewer and interviewee. See id. at —, 135 S.Ct. at 2181, 192 L.Ed.2d at 316 (noting that .“the first objective was to protect L.P.” and L.P. “never hinted that he intended his statements to be used by the police or prosecutors”). The Court also stressed that the conversation was “informal and spontaneous.” Id.
Weighing all the circumstances here, and considering the role of both participants in the conversation, the following factors support a determination that the Confrontation Clause was not violated under the primary-purpose test: First, it is obvious that A.W.’s purpose was not to make a statement to Dr. Harre that could be used to prosecute J.C. Second, the setting was informal. Dr. Harre and A.W. met by themselves at Dr. Harre’s office. Dr. Harre first asked A.W. to make letters on an easel board, and went over truth-lie differences. Shé then conducted a “medical review of systems,” asking A.W. about areas of discomfort or signs of illness. After doing so, she asked A.W. if she could remember what happened with her brother’s friend. Dr. Harre then conducted a full physical exam, at that .point with A.W.’s father present. Dr. Harre took notes throughout the entire process, but no recording took place. Dr. Harre later dictated from her notes. The discussion of the incident with J.C. represented a single paragraph in the five-page report.
Third, while it appears that law enforcement made the original referral that led to Mattox’s forensic interview in early July, any law enforcement role in arranging Dr. Harre’s session with" A.W. in late July would have been more attenuated. The two encounters took place three weeks apart, and Dr. Harre did not have access to the forensic interview when she examined and spoke with A.W. Furthermore, according to Dr. Harre, she receives referrals from “police departments, [DHS], other physicians, therapists, [and] emergency rooms,” and she performed the standard evaluation with A.W. that she would perform with “any other child.” '
To be fair, when we view the matter from Dr. Harre’s perspective alone, the session likely served “two purposes” — analyzing AW.’s medical condition and memorializing-her story; See State ex rel. Juv. Dep’t of Multnomah Cty. v. S.P., 346 Or. 592, 215 P.3d 847, 865 (2009) (en banc) (finding, pre-Clark, • a) Sixth Amendment violation when a three-year-old’s statements during an interview with' a child abuse response center were admitted at *458 trial). Dr. Harre was providing medical assessment, but her report was addressed to the-assistant county attorney who later prosecuted the case.
However, when we consider the totality of circumstances under the primary-purpose test, as well as the additional points emphasized by the Supreme Court in Clark, we find no Sixth Amendment violation. Several things distinguish this case from Bentley and the Oregon Supreme Court’s decision in S.P. No law enforcement personnel attended or monitored Dr. Harre’s session with A.W. Cf. Bentley, 739 N.W.2d at 297; S.P., 215 P.3d at 860. In fact, a recorded forensic interview with law enforcement on site had already occurred when Dr. Harre met with A.W. without law enforcement. Moreover, A.W. was considerably younger than the ten-year-old victim in Bentley[7] — an important consideration according to the Clark Court.
Finally, and crucially, we cannot ignore the Supreme Court’s pronouncement, that “[statements by very young children will rarely, if ever, implicate the Confrontation Clause,” as well as the Court’s reliance on the historical record, which indicates that hearsay statements of child witnesses who were incompetent to testify were admitted at common law. Clark, 576 U.S. at —, 135 S.Ct. at 2181-82, 192. L.Ed.2d at 316-17.
Since J.C. does not urge us to apply a different approach under article I, section 10 of the Iowa Constitution, we decline to do so in this case. Thus, we find that admission of Dr. Harre’s testimony and written report did not violate J.C.’s confrontation rights under either the Sixth Amendment or article I, section 10 of the Iowa Constitution.
Still, we close our discussion of Dr. Harre’s interview with a few words of caution. Under a primary-purpose test, we do not believe an interview whose primary purpose is testimonial generally can be salvaged just because it is wedged inside a medical exam. The primary-purpose test applies to “the interrogation” that is at issue. Id. at —, 135 S.Ct. at 2180, 192 L.Ed.2d at 314. In addition, we do not believe that arranging a prior recorded forensic interview necessarily insulates a subsequent less-formal interview from attack- under the Confrontation Clause. Lastly, as stated already, we jealously guard our authority, to interpret the Iowa Constitution independently in a future case, particularly if a litigant -argues such an interpretation in her or his briefing.
B. Confrontation Clause— Mattox. We now turn t'o whether the admission of Mattox’s testimony violated J.C.’s Confrontation Clause rights. Despite A.W.’s veiy young age, we will assume without deciding that a violation occurred. Mattox’s job title is “forensic interviewer.” See Bentley, 739 N.W.2d at 299 (noting that the interview was described by a police officer as a" “forensic interview”). Law enforcement made a referral call for Mattox’s interview of A.W., and law enforcement was present when it occurred. The interview was ’recorded, and the recording was provided to the county attorney’s office. Sée id. at 300 (noting that a copy of the tape was provided to police and marked as evidence). ' '
Having said this, we agree with the court of appeals that any error was harmless. See Kennedy, 846 N.W.2d *459 at 527 (“The erroneous admission of evidence in violation- of, the Confrontation Clause is a constitutional error subject to a harmless-error analysis.”). To find a constitutional error harmless, “[w]e are required to ask whether the force of the evidence ‘is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have .been the same’ without the erroneously admitted evidence.” Id. at 528 (quoting Yates v. Evatt, 500 U.S. 391, 405, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432, 449 (1991)); In this context, harmless error means “no reasonable possibility that [the erroneously admitted] evidence might have contributed to the [adjudication].” Id. (quoting State v. Hensley, 534 N.W.2d 379, 383 (Iowa 1995)). The State bears the burden of establishing harmless error. Id. at 527.
Here, the other evidence against J.C. was quite strong. Unlike in many child abuse cases, there were other' eyewitnesses to the act of abuse besides the victim — namely M.M., I.W., and E.W. As the juvenile court put it, “The eyewitness accounts alone are quite persuasive in this case and appear credible due to the differences which are explained -by the- order they entered the-room.” .Furthermore, as noted by the juvenile court, there was recorded evidence of J.C.’s “heightened interest in sexual activity on the date in question.” J.C.’s testimony that he was trying to, get A,W. out of the room was contradicted by the eyewitnesses; furthermore, J.C. had no explanation for the cell phone recording. And Dr. Harre’s testimony and report provided further confer mation that an assault with intent to commit sexual abuse had occurred. In short, the remaining evidence- was so strong that we see no reasonable possibility Mattox’s testimony might have contributed to the adjudication. See id. at 528.
C. Competency of A.W. J.C. also challenges .the admission of A.W.’s out-of-court statements to Dr. Harre on the basis that A.W. was incompetent to testify herself and, thus, Dr. Harre should not. have been allowed to testify regarding A.W.’s statements. We will assume for the purposes of this analysis that A.W. was incompetent to testify. We have not previously addressed whether out-of-court statements made by incompetent witnesses may be admissible under exceptions to the hearsay rule.
Dr. Harre’s testimony and her report of Her interview with A.W. were admitted under' Iowa Rule of Evidence 5.803(4) as statements made for the purpose of obtaining medical diagnosis or treatment. Significantly, J,C. does not appeal that ruling. Also, in Clark, the United States Supreme Court implicitly rejected the argument that a child’s incompetence to appear as a trial witness foreclosed the admission of that same child’s out-of-court statements:
Clark is also wrong to suggest that admitting L.P.’s statements would be fundamentally unfair given that Ohio law does not allow incompetent children to testify. In . any. Confrontation Clause case., the individual who provided the out-of-court statement is not available as an in-court witness, but the testimony is admissible under an exception to the hearsay rules and is probative of the defendant’s guilt. The fact that the witness is unavailable because of a different rule of evidence does jtot change our analysis.
Clark, 576, U.S. at —, 135 S.Ct. at 2183, 192 L.Ed.2d at 318. In addition, the Supreme Court has rejected the argument that., an incompetent declarant’s out-of-court statements are “presumptively unreliable.” . Idaho v. Wright, 497 U.S. 805, 824, 110 S.Ct. 3139, 3151,. 111 L.Ed.2d 638, 658 (1990).
*460 Other courts have reached similar conclusions. See Morgan v. Foretich, 846 F.2d 941, 949 (4th Cir.1988) (“The fact that a young child may be incompetent to testify at trial affects neither prong of the two-part test for admitting evidence under 803(4).”); Borchgrevink v. State, 239 P.3d 410, 423 (Alaska Ct.App.2010) (“[C]ourts have admitted hearsay under this exception even when the person who made the out-of-court statement was incompetent to testify.”), overruled on other grounds by Moreno v. State, 341 P.3d 1134 (Alaska 2015); State v. Waddell, 130 N.C.App. 488, 504 S.E.2d 84, 90 (1998) (rejecting the argument that the child’s incompetence rendered his out-of-court statements for purposes of medieal diagnosis or treatment inadmissible); State v. Muttart, 116 Ohio St.3d 5, 875 N.E.2d 944, 954 (2007) (“[Regardless of whether a child less than ten years old has been determined to be competent to testify ,, the child’s statements may be admitted at trial as an exception to the hearsay rule pursuant to [rule] 803(4) if they were made for purposes of medical diagnosis or treatment.”). But see B.B. v. Commonwealth, 226 S.W.3d 47, 51 (Ky.2007) (holding that a child victim’s out-of-court statements should have been excluded because “the immaturity that rendered her incompetent at trial would have existed at the time of the interview as well”). As one treatise has said,
Out-of-court stateinents for purposes of medical diagnosis or treatment may in some instances be admissible despite lack of testimonial competence when the statement was made. Statements for purposes of diagnosis or treatment are considered reliable because the patient has an incentive to be truthful- with the physician. A child who lacks - one or more elements of testimonial competence may nevertheless possess the incentive required by the diagnosis or treatment exception.
John E.B. Myers, Myers on Evidence of Interpersonal Violence, Child Maltreatment, Intimate Partner Violence, Rape, Stalking, and Elder Abuse § 7.20 (2016) (footnote omitted).
We affirm the juvenile court’s ruling that A.W.’s incompetence to testify at trial did not render Dr. Harre’s testimony and report per se inadmissible.
IY. Conclusion.
For the foregoing reasons, we affirm J.C.’s adjudication.
DECISION OF COURT OF APPEALS AFFIRMED AND JUVENILE COURT JUDGMENT AFFIRMED.
• All justices concur except CADY, C.J., who concurs specially, and WIGGINS, J., and HECHT and APPEL, JJ., who dissent.

. At one point, law enforcement sent in questions requesting more detail in one subject area, and those questions were put to A.W. by Mattox and answered.

. J.C.’s counsel did not specify whether he was referring to the Confrontation Clause of ' the United Slates Constitution, or that of the Iowa Constitution,

. Dr. Harre testified that A.W. "was referred from the ... emergency room where she was seen on July 3.” Her report, however, indicates that Mattox made the referral following the forensic interview. A police officer, meanwhile,- testified that he directed A.W.'s parents to Dr. Harre’s office so A.W. could be examined. However, A.W.’s mother testified that "the hospital told me to make an ap- • pointment with the doctor lady to talk to her and find out if there was anything else going on, and that's what I did.”

. The reversal was unanimous. Clark, 576 U.S. at -, 135 S.Ct: at 2177, 192 L.Ed.2d at 311. Justice Alito wrote the opinion for the Court, which a total of six justices joined. Id. Justice Scalia wrote a separate opinion concurring in the judgment. Justice Thomas also wrote a separate opinion concurring in the judgment. Id. Justice Ginsburg joined Justice Scalia’s separate opinion. Id.

. In his separate opinion concurring in the judgment, Justice Scalia gave primacy to the primary-purpose test. Clark, 576 U.S. at -, 135 S.Ct. at 2184-85, 192 L.Ed.2d at 319-20 (Scalia,-J., concurring in the judgment). He explained,
The Confrontation Clause categorically entitles a defendant to be confronted -with the witnesses against him;'- and the primary-purpose test sorts- out, among'the many people who interact with the police informally, who is acting as a witness and who is not. Those who fall into the former category bear testimony, and are therefore acting as "witnesses," subject to the right of confrontation.
Id. at -, 135 S.Ct. at 2185, 192 L.Ed.2d at 320. Justice Scalia concurred in the result because, in his view, the primary-purpose test had not been met. Id. at -, 135 S.Ct. at 2184, 192 L.Ed.2d at 318-19, He also criticized parts of the majority opinion going beyond the primary-purpose test as "dicta” that in his view were "not binding.” Id. at -, 135 S.Ct. at 2184, 192 L.Ed.2d at 319.
The academic community is only just starting to weigh in on Clark. The only published law review article we have been able to find by a law professor — as opposed to a blog or a .law student note — reviewed the Court’s entire opinion and then concluded, "Which of these points was essential to the Court's conclusion that the Confrontation Clause did not apply was not obvious.” David L. Noll, Constitutional Evasion and the Confrontation Puzzle, 56 B.C. L. Rev. 1899, 1917 n. 158 (2015).
Furthermore, "[cjarefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." United States v. Oakar, 111 F.3d 146, 153 (D.C.Cir.1997) (alteration in original) (quoting Doughty v. Underwriters at Lloyd’s, London, 6 F.3d 856, 861 n. 3 (1st Cir.1993)).
It is also noteworthy that Justice ■ Scalia— widely known as an originalist — did not reject the possibility that out-of-court statements by small children” would be admissible today based on their admissibility at common law, even if they were deemed testimonial under the primary-purpose test. All he said was that once’evidence is "testimonial,” i.e., as determined under the primary-purpose test, the burden rests with the prosecutor “to prove a long-established practice" of introducing this category of evidence "for which cross-examination1 was not typically necessary.” Clark, 576 U.S. at -, 135 S.Ct. at 2185, 192 L.Ed.2d at 320. Justice Scalia also cited the Lyon and LaMagna article with approval. Id. at -, 135 S.Ct. at 2184, 192 L.Ed.2d at 319, So it is entirely plausible that Justice Scalia would have agreed: Out-of-court statements by very young children who are not competent to testify do not raise Confrontation Clause concerns today because they did not raise admissibility concerns in the eighteenth century.

. For one thing, A.W.’s statements were not made "in the context of an ongoing emergency,” but well after law enforcement had commenced their- investigation. Cf. Clark, 576 U.S. at —, 135 S.Ct. at 2181, 192 L.Ed.2d at 315.

. We noted in Bentley that the victim functioned at a seven-year-old level, see 739 N.W.2d at 300, but this is still much older than A.W.’s chronological age or the level of her communication skills..