# IN THE SUPREME COURT OF IOWA

No. 18–2116

Submitted October 15, 2020—Filed April 23, 2021

**STATE OF IOWA,**

   Appellee,

vs.

**SHANNA DESSINGER,**

   Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Webster County, Angela L. Doyle, Judge.

The defendant seeks further review from a court of appeals decision affirming the defendant's conviction of child endangerment. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED, SENTENCING ORDER AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED FOR RESENTENCING.**

Appel, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy (argued), Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kyle Hanson (argued), Assistant Attorney General, and Darren D. Driscoll, County Attorney, for appellee.

**APPEL, Justice.**

In this case, we consider an appeal by Shanna Dessinger arising from her conviction of child endangerment. Dessinger asks for a new trial claiming that (1) several pieces of hearsay evidence were improperly admitted, (2) her Confrontation Clause rights were violated, (3) her trial counsel was ineffective, and (4) the district court failed to consider an ability-to-pay determination before imposing court costs.

The court of appeals affirmed Dessinger's conviction but vacated the portion of the sentence regarding restitution and remanded to the district court for resentencing. We granted further review. For the following reasons, we affirm Dessinger's conviction and remand the case to the district court for resentencing.

## I. Factual and Procedural Background.

**A. Introduction.** Shanna Dessinger began work at Tracey's Tots daycare in Fort Dodge, Iowa, in January 2018. On the afternoon of May 9, 2018, Dessinger was involved in an incident at Tracey's Tots where she allegedly intentionally choked and pushed to the floor a four-year-old child, D.A.J. As a result of the incident, the State charged Dessinger with child endangerment in violation of Iowa Code sections 726.6(1)(*a*) and 726.6(7) (2018). Dessinger plead not guilty

**B. District Court Proceedings.**

1. *Motion in limine.* A week prior to trial, Dessinger filed a motion in limine related to several evidentiary matters. Specifically, Dessinger challenged the competency of D.A.J. to testify based on recent deposition testimony that Dessinger asserted showed D.A.J. did not understand the concept of truth and lies. Dessinger further noted that D.A.J. and Demetria Gully were the only witnesses who viewed the event and that other witnesses' testimony could implicate the Confrontation

Clause, involve multiple levels of hearsay, and would be inadmissible. The State responded by denying that D.A.J. was incompetent, and as to other hearsay statements, the State asserted that "[t]hese are exceptions to the hearsay rule."

The issues raised in the motion in limine were considered by the district court on the first day of trial. The district court concluded that D.A.J. was competent to testify but ruled that the prosecution could not lead the witness and must use only open questions. On the hearsay questions, the district court said that hearsay would not be admissible unless a hearsay exception applied but offered no further ruling.

2. *Trial evidence.* At trial, the prosecution did not offer testimony from D.A.J. The State offered testimony from Gully, Officer Paul Samuelson, and Cori Jewett. A summary of the testimony of the State's trial witnesses follows.

Gully testified she was seventeen years old, in high school, and was at her first day of work at Tracey's Tots. She testified that on the day in question, she observed one of Dessinger's pupils climbing on a playground fence. Gully stated she told Dessinger to intervene but that she responded that she didn't care what the child was doing because she was quitting at the end of the day. Gully concluded Dessinger was just having a hard day and was overwhelmed at the moment.

Later on the day of the incident, Gully was working in the two-year-old room. The two-year-old room was located next to the preschool room. The wall between the rooms featured a large window. Gully testified that she saw Dessinger grab D.A.J. by the neck in a choking motion and then release his neck and push the child to the ground. According to Gully, D.A.J. immediately thereafter was screaming and crying "I'm sorry, I'm sorry, I'm sorry." Gully testified that there was no chance the incident was

an accident. Gully immediately went to her supervisor Jewett to report the matter.

On cross-examination, Gully testified that after the incident, she and Jewett "both talked to [D.A.J.] and asked him what happened and he showed us what happened." On redirect examination, the State asked Gully what she observed D.A.J. demonstrating to her and Jewett. Dessinger's counsel objected on hearsay grounds. The district court overruled the objection, concluding that the witness could not testify to any words the child said but could describe the child's conduct during the demonstration. Gully then testified that D.A.J. grabbed Jewett by the neck and engaged in lifting as if he was lifting himself up. Gully testified that she would characterize the demonstration as choking.

Fort Dodge Police Officer Paul Samuelson testified on behalf of the State. He told the jury that on the day of the incident, he was dispatched to the lobby of the Fort Dodge Police Department where someone was making a report of a child allegedly being abused at a daycare. He testified that in the lobby, D.A.J.'s parents informed him that he had been picked up and then put down at the daycare facility. As a result of the statements of the parents, Samuelson testified that he spoke immediately with Gully. Based on his investigation, Samuelson "believed it was a credible allegation."

Jewett testified that Gully came to her office at about 3:00 p.m. to report the incident. While Gully made her report, Jewett believed she could hear D.A.J. crying in the other room. When she entered the nearby room D.A.J. was whimpering. Upon entering the room, Jewett asked Dessinger to get her things and leave.

The State sought testimony from Jewett about D.A.J.'s postincident demonstration. Jewett testified that D.A.J. put his hands around his neck

in a fashion like he was being choked. When D.A.J.'s father came to pick up D.A.J., Jewett explained to him what had been reported to her and what D.A.J. had shown her.

After the State rested, Dessinger took the stand on her own behalf. She responded to Gully's testimony about her frustration with a child climbing the fence that she had already instructed the child three times not to do so. She admitted responding to Gully that she did not care and was going to quit anyway but claimed that the momentary frustration passed quickly.

Dessinger testified that after being outdoors, the children returned to the building and played nicely. Dessinger testified that D.A.J. was playing wearing a dress-up apron. She asserted that D.A.J. needed help with adjusting the apron, that she was assisting D.A.J. with the apron when she lost her balance, hit a bookshelf, and the apron ended up in her hand. Dessinger denied that D.A.J. was upset, crying "I'm sorry," or whimpering.

Dessinger testified that Gully was mistaken in her description of what she saw. She admitted that she might have knocked D.A.J. over when she lost her balance, but she insisted that anything that happened on that day was an accident.

3. *Jury verdict and judgment.* The jury convicted Dessinger, as charged, of child endangerment. In entering judgment, the district court ordered Dessinger to pay "the court costs of this action." The district court determined, however, that Dessinger lacked the ability to pay the court-ordered attorney fees and thus ordered $0 in attorney fees reimbursement. The district court further ordered that the defendant pay fees for room and board as later assessed. The district court stated that the amount of room and board assessed by the sheriff and filed with the clerk shall have the

force and effect of a judgment unless the defendant affirmatively requests a hearing to dispute the amount assessed.

Dessinger appealed. We transferred the case to the court of appeals.

**C. Decision of Court of Appeals.** On the hearsay issues, the court of appeals believed that error was preserved by Dessinger's objection to Gully's testimony regarding D.A.J.'s demonstration, and that despite no explicit objection, the court's overruling of the objection preserved error for Jewett's subsequent testimony also regarding D.A.J.'s conduct. However, the court of appeals did not believe error was preserved on the testimony by Jewett and Officer Samuelson regarding verbal statements D.A.J. made to each of them.

The court of appeals held that D.A.J.'s nonverbal demonstration was in fact a hearsay statement. The court of appeals did not decide whether the statements met a hearsay exception, instead, holding that the demonstration evidence was merely cumulative because their substance was the same as the already admitted verbal assertions, so their admission would not justify reversal.

The court of appeals determined that Dessinger did not preserve her Confrontation Clause challenge. Despite raising the concern in her motion in limine and in a challenge to D.A.J.'s competency, Dessinger made no objection at trial, and the district court did not rule on the issue.

On the ineffective-assistance-of-counsel claims, Dessinger argued that her counsel was ineffective in three ways: first, counsel failed to raise hearsay objections about D.A.J.'s verbal statements; second, counsel failed to raise Confrontation Clause objections; and third, counsel failed to object to testimony from Officer Samuelson concerning his opinion on whether the allegation that D.A.J. had been abused was credible. Because

the record was not fully developed to rule on the issues, the court of appeals preserved all three issues for postconviction-relief proceedings.

Finally, Dessinger argued that the district court failed to make a proper reasonable-ability-to-pay determination regarding her restitution costs. The court of appeals found that the district court did not make an ability-to-pay determination, and therefore, vacated the restitution portion of the sentencing order and remanded for resentencing to be in compliance with a reasonable-ability-to-pay determination.

## II. Standard of Review.

District court decisions on whether to admit or exclude evidence are typically reviewed for an abuse of discretion. *State v. Parades*, 775 N.W.2d 554, 560 (Iowa 2009). We review hearsay claims, however, for corrections of errors at law. *Id.* The correction for errors at law standard is applicable in determining whether evidence that would generally be prohibited as hearsay comes in under a hearsay exception. *Id.*

Confrontation Clause claims are constitutional in nature and derived from the Sixth Amendment of the United States Constitution and article I, section 10 of the Iowa Constitution. We review claims of constitutional violations de novo. *State v. Meyers*, 938 N.W.2d 205, 208 (Iowa 2020). Ineffective-assistance claims are also reviewed de novo. *State v. Gordon*, 943 N.W.2d 1, 3 (Iowa 2020).

Finally, Dessinger raises challenges to the district court's restitution. "We review restitution orders for correction of errors at law." *State v. Albright*, 925 N.W.2d 144, 158 (Iowa 2019).

## III. Discussion of Hearsay Issues.

**A. Hearsay Overview.** Dessinger raises three challenges to the admission of evidence. First, Dessinger argues that both Gully and Jewett's testimony regarding D.A.J.'s out-of-court nonverbal

demonstration to them constitutes hearsay and that the district court erred by permitting Gully and Jewett to testify regarding the demonstration. Second, Dessinger argues that Jewett's testimony of D.A.J.'s father about his son's out-of-court statements corroborating the demonstration is hearsay and should have been excluded. Third, Dessinger argues that Officer Samuelson's testimony about D.A.J.'s out-of-court verbal statements corroborating the event is hearsay.

The State responds by arguing that D.A.J.'s nonverbal demonstration, even if it constitutes hearsay, should nevertheless be admitted as either an excited utterance or present sense impression exception to the general rule prohibiting hearsay evidence. The State argues that Officer Samuelson's testimony should be admitted to explain the officer's subsequent conduct in pursuing charges. Finally, the State argues that any error was nonprejudicially cumulative.

**B. Admissibility of D.A.J.'s Nonverbal Demonstration.**

1. *Preservation of error.* Before we consider the merits of the admissibility of the nonverbal demonstration evidence, we must first address the threshold question of error preservation. The record reveals that Dessinger objected to Gully's testimony regarding D.A.J.'s demonstration on hearsay grounds. The district court overruled the objection to the extent it related to the nonverbal demonstration by D.A.J. Dessinger's counsel, however, did not make a similar objection to parallel testimony by Jewett. The question arises whether the unsuccessful objection related to Gully was sufficient to preserve the issue with respect to the testimony of Jewett.

"The preservation of error doctrine is grounded in the idea that a specific objection to the admission of evidence be made known, and the trial court be given an opportunity to pass upon the objection and correct

any error." *State v. Brown*, 656 N.W.2d 355, 361 (Iowa 2003). The doctrine is rooted in principles of fairness where neither the state nor the defendant can raise a new claim or defense on appeal that could have been, but failed to be, raised at trial. *DeVoss v. State*, 648 N.W.2d 56, 63 (Iowa 2002).

When Gully was asked about D.A.J.'s demonstration, Dessinger's counsel timely objected twice on hearsay grounds. The district court split the baby. It upheld the objection with respect to any verbal statements made by D.A.J. to Gully but allowed testimony from Gully describing nonverbal acts made by D.A.J. Jewett was then asked similar questions about D.A.J.'s demonstration. Dessinger's counsel, however, did not contemporaneously object.

We have held, however, that "[r]epeated objections need not be made to the same class of evidence." *State v. Kidd*, 239 N.W.2d 860, 863 (Iowa 1976); *see also State v. Padgett*, 300 N.W.2d 145, 146 (Iowa 1981) ("[A]dditional objections on the same ground to testimony of the same kind would be to no avail."). Certainly the testimony of Jewett regarding D.A.J.'s demonstration was of the same class as Gully's potential testimony about the same event, and as a result, any objection would not have succeeded. Therefore, Dessinger was not required to repeat the objection regarding Jewett's testimony about D.A.J.'s nonverbal acts in his demonstration.

The district court, however, granted the objection with respect to verbal statements made by D.A.J. when he was with Gully and Jewett. The general rule is that where an objection is sustained, it must be repeated each time similar testimony is offered by the opposing party. *See, e.g., Hariri v. Morse Rubber Prods., Co.,* 465 N.W.2d 546, 548–49 (Iowa Ct. App. 1990). As a result, any objection to the testimony of Jewett related

to the verbal statements made by D.A.J. at the time he met with Gully and Jewett were not preserved.

2. *Is the nonverbal demonstration inadmissible hearsay?* Hearsay is defined as a statement that a "declarant does not make while testifying at the current trial" and which "[a] party offers into evidence to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(*c*). A statement can be an oral or written assertion or "[n]onverbal conduct, if intended as an assertion." *Id.* r. 5.801(*a*). While the term assertion is not defined in the rule, it is typically regarded as "a statement of fact or belief." *State v. Dullard*, 668 N.W.2d 585, 590 (Iowa 2003).

Some insight is provided by an advisory committee note of the Federal Rules of Evidence. The advisory committee note on a parallel federal rule provides that not all nonverbal conduct is assertive, but actions "such as . . . pointing to identify a suspect in a lineup, is clearly the equivalent of words, assertive in nature, and to be regarded as a statement." *Id.* at 592 (quoting Fed. R. Evid. 801(a) advisory committee note).

There is some authority on the question of whether nonverbal acts constitute impermissible hearsay. For example, in *State v. Galvan*, the court considered nonverbal conduct of a child who behaved in a bizarre manner by taking a belt from her mother and binding her hands, beating her chest, and crying while watching a cartoon where a mouse was tied up. 297 N.W.2d 344, 346 (Iowa 1980). The court regarded the demonstration as a hearsay description of a murder the child had seen. *Id.* Other examples of nonverbal assertive conduct might include nodding, sign language, or "a videotape of the injured plaintiff recreating the accident which caused his injuries." 6 Michael H. Graham, *Handbook of Federal Evidence* § 801:2, at 388–89 (8th ed. 2016); *see also State v.*

*Mueller*, 344 N.W.2d 262, 264–65 (Iowa Ct. App. 1983) (holding that the nonverbal conduct of a child acting out a "sex act" on a doll was an assertion).

Based on our review of the record, we conclude that D.A.J.'s nonverbal conduct was intended as an assertion. In response to questioning from Gully and Jewett about the alleged altercation with Dessinger, D.A.J. demonstrated the incident by grabbing Jewett by the neck and lifting up, which Gully described as "choking." The demonstration was a clear attempt to illustrate what Dessinger had allegedly done to D.A.J. Therefore, it was an assertive conduct as to the incident. An out-of-court assertion, through conduct, used to prove the truth of the matter asserted, namely that Dessinger in fact chocked D.A.J., is by definition hearsay.

3. *Is the nonverbal hearsay admissible under the present sense exception to the hearsay rule?* Although testimony about the demonstration was hearsay, the question arises whether the evidence was admissible under an exception to the hearsay rule. We consider the applicability of exceptions in criminal cases even when not urged at trial as there is no point in reversing a conviction when the evidence will be admissible at retrial in any event. *See DeVoss*, 648 N.W.2d at 63.

One potentially applicable exception to the hearsay rule is present sense impression. Present sense impression involves "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Iowa R. Evid. 5.803(1).

The rationale behind the present sense impression exception is that the declarant has no opportunity to fabricate a statement if the statement is made during or "immediately" after the event. *See Fratzke v. Meyer*, 398 N.W.2d 200, 205 (Iowa Ct. App. 1986). "Precise contemporaneity" may not

always be possible and the exception will allow for "a slight lapse between event and statement." *Id.* (citing Fed. R. Evid. 803 advisory committee note). However, the further a declarant is from the event, the more likely the declarant is to misstate or fabricate. *See, e.g.*, Edward J. Imwinkelreid, *The Need to Resurrect the Present Sense Impression Hearsay Exception: A Relapse in Hearsay Policy*, 52 How. L.J. 319, 345 (2009) ("When the thought process is complex, involving an intermediate step between the receipt of the present sense impression and the utterance," the statement should no longer qualify. (footnote omitted)); Jon R. Waltz, *The Present Sense Impression Exception to the Rule Against Hearsay: Origins and Attributes*, 66 Iowa L. Rev. 869, 880 (1981) ("[T]here should be no delay beyond an acceptable hiatus between perception and the cerebellum's construction of an uncalculated verbal description."). Therefore, any deviations from exact contemporaneity should not exceed "the time needed for translating observation into speech" nor should the deviation allow for any "reflective thought." 2 *McCormick on Evidence* § 271, at 385 (Robert P. Mosteller ed., 8th ed. 2020). The translation might include turning to the person next to you, walking into another room in the house or office, or picking up your phone to call or text someone to report the event.

The Iowa Court of Appeals has addressed the present sense impression exception in relation to children. The court of appeals found that the exception was met in *Fratzke*, when the declarant, a ten-year-old boy, made his statements within fifteen to twenty minutes after an accident. 398 N.W.2d at 205. Cases from other jurisdictions consider similar gaps in time, with varying results. *See, e.g.*, *United States v. Manfre*, 368 F.3d 832, 840 (8th Cir. 2004) (holding the exception inapplicable because an intervening walk or drive was too far removed since it provided the "opportunity for strategic modification [which]

undercuts the reliability that spontaneity insures"); *Hilyer v. Howat Concrete Co.*, 578 F.2d 422, 426 n.7 (D.C. Cir. 1978) (holding exception inapplicable after fifteen minutes unless the declarant was still under excitement); *Bruce v. State*, 346 P.3d 909, 923 (Wyo. 2015) (holding exception inapplicable after gap of twenty to twenty-five minutes). *But see United States v. Blakey*, 607 F.2d 779, 785–86 (7th Cir. 1979) (allowing exception after twenty-three-minute gap); *State v. Cummings*, 389 S.E.2d 66, 75 (N.C. 1990) (allowing exception after a short drive of roughly thirty minutes). Other jurisdictions, however, require strict contemporaneity. *See, e.g., State v. Smith*, 909 P.2d 236, 240 (Utah 1995) (holding that a present sense impression exception requires the statement to be "strictly contemporaneous" with the event).

Some cases rely not so much on the time lag but on an analytical distinction. For example, in *People v. Vasquez*, the New York Court of Appeals stated that a "marginal time lag" is permitted but the communication must truly represent a present sense impression instead of a recalled "description of events that were observed in the recent past." 670 N.E.2d 1328, 1334 (N.Y. 1996). In other words, the person must be providing a current description of the sensory impressions of an event rather than a mental process. *See, e.g., United States v. Orm Hieng*, 679 F.3d 1131, 1145–47 (9th Cir. 2012) (Berzon, C.J., concurring) (arguing that actions like calculating or tallying marijuana plants use mental processes rather than the mere report of a sensory impression).

In this case, the record does not explicitly indicate the time gap between the incident and the demonstration. The record reflects that Gully reported Dessinger's alleged action to Jewett "as soon as [Gully] noticed what was happening." Gully's report to Jewett took "a couple minutes." When Jewett heard the report, Jewett went to the room and

asked Dessinger to leave. After receipt of Gully's report and Dessinger's removal, D.A.J. demonstrated to Jewett and Gully Dessinger's alleged act of grabbing D.A.J. by the neck.

On balance, we conclude that the demonstration by D.A.J. was more in the nature of recalled memory than present sense impression. D.A.J. was responding to questions posed by Jewett. He was describing past events at the request of a third party. There was nothing spontaneous about it. And, while precise contemporaneity is not required, there was a passage of time that tends to undercut the present sense impression theory. We decline to apply the present sense impression exception to the rule against hearsay to D.A.J.'s demonstration.

4. *Is the nonverbal hearsay admissible as an excited utterance?* An alternative theory to admissibility is the excited utterance exception. An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Iowa R. Evid. 5.803(2). The statement must be made under the excitement of the incident and not on reflection or deliberation. *State v. Mateer*, 383 N.W.2d 533, 535 (Iowa 1986). The rationale for the exception is that when a declarant makes a statement under the stress of the excitement, the declarant is less likely to fabricate than if the statement was made under reflection or deliberation. *State v. Tejeda*, 677 N.W.2d 744, 753 (Iowa 2004).

In *State v. Atwood,* we established a five-factor test to determine whether a statement will qualify as an excited utterance:

> (1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of the event being described, and (5) the subject matter of the statement.

602 N.W.2d 775, 782 (Iowa 1999).

While time-lapse is important, statements made hours and even days after the event have been admissible. *See, e.g.*, *Mateer*, 383 N.W.2d at 535 (one hour); *Galvan*, 297 N.W.2d at 346 (two days); *State v. Stevens*, 289 N.W.2d 592, 596 (Iowa 1980) (one hour); *State v. Stafford*, 237 Iowa 780, 785–87, 23 N.W.2d 832, 835–36 (1946) (fourteen hours). The time-lapse allowed for statements by a child may be more likely to be on the high-end of the range permitted. *See, e.g., State v. Hy*, 458 N.W.2d 609, 610–11 (Iowa Ct. App. 1990) (roughly seventeen hours); *see also State v. Dudley*, 856 N.W.2d 668, 680 (Iowa 2014) (stating "it is permissible to allow a greater amount of time lapse for children who make the statements to a parent or other safe adult, at the soonest possible time after the abuse occurred," but rejected applying the exception for a child's statement made to a neighbor thirty-six hours after the abuse had occurred and after the child had previously told her mother).

A statement in response to questioning "does not automatically disqualify it as an excited utterance." *State v. Harper*, 770 N.W.2d 316, 320 (Iowa 2009); *see also Atwood*, 602 N.W.2d at 782–83 (response to question about "what happened" was deemed an excited utterance). But, questions asked to children may be particularly suspect because they could be "calculated to elicit information which would otherwise have been withheld." *State v. Brown*, 341 N.W.2d 10, 13 (Iowa 1983) (en banc) (quoting *State v. Watson*, 242 N.W.2d 702, 704 (Iowa 1976)); *see also Dudley*, 856 N.W.2d at 680 (rejecting the exception because of the time period, thirty-six hours, and the fact that the declarant "required more than one prompting question before she made the statements.").

There is some illustrative caselaw from other jurisdictions. For instance, in a Vermont case, statements made by a child in the course of

a long police interrogation were held not to be excited utterances because the statements in a police interrogation typically result from a "rational dialogue." *State v. Roy*, 436 A.2d 1090, 1092 (Vt. 1981). Similarly, in a Texas case, the court noted that if the stressful event triggering the statement is distinguishable from the original anxiety-producing event, the statement may not be admissible. *See Glover v. State*, 102 S.W.3d 754, 764–65 (Tex. App. 2002). A New Jersey court followed similar logic, noting that an interrogation or aggressive and leading questions may eliminate spontaneity. *See State v. D.G.*, 723 A.2d 588, 595 (N.J. 1999). In contrast, however, when the statements do not result from a rational dialogue, or the questioning from others is more general such as, "What happened?" the statements will be more likely to fall under the excited utterance exception. *See, e.g.*, *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir. 1980); *James v. State*, 888 P.2d 200, 206–07 (Wyo. 1994).

Finally, the totality of the circumstances are considered in determining whether a statement has sufficient spontaneity to qualify as an excited utterance. For example, when a woman came into the hospital severely burned, with "her skin . . . still smoldering and the pain of the event . . . still continuing" her statements concerning her condition of "[p]lease don't kill me[,] Harper did it" were "not reflective or deliberative, but rather made under the stress of her situation." *Harper*, 770 N.W.2d at 320.

We think that applying the *Atwood* factors leads to the conclusion that the demonstration qualifies as an excited utterance. The time gap is relatively short. The record reveals that Gully and Jewett "both talked to [D.A.J.] and asked him what happened and he showed [them] what happened." Asking a child "what happened" does not seriously undercut application of the excited utterance exception if the child is still under

stress from the event. In the aftermath of the event, there was testimony that D.A.J. was screaming that "he was sorry . . . over and over again." Jewett testified that prior to her questioning of D.A.J., he was "upset, and he was off by himself in the room," and that Jewett "could hear [D.A.J.] crying [and whimpering] in the other room."

Overall, D.A.J.'s conduct is admissible under the *Atwood* test as an excited utterance. While D.A.J.'s young age and questions posed by teachers leaves some doubt as to whether it was the questioning rather than D.A.J.'s excitement that elicited the demonstration, based on the record, D.A.J. was under the stress of an anxiety-producing event because just prior to the demonstration he could be heard crying and whimpering, and the time period between the alleged incident and the questioning was quite close in time. Therefore, his statements fall under the excited utterance exception.

**C. Admissibility of Jewett's Testimony Regarding Consistency of Statements by D.A.J.'s Father with What D.A.J. Had Demonstrated.**
Jewett testified that the statements told by D.A.J. to his father were consistent with what the child had earlier demonstrated to Gully and Jewett. Dessinger's counsel did not object to this testimony. Dessinger contends that no objection was necessary because she had already unsuccessfully objected to nonverbal testimony arising from D.A.J.'s demonstration when Gully testified. The question arises whether Dessinger's earlier unsuccessful objection to the testimony of Gully regarding D.A.J.'s demonstration was sufficient to preserve an objection to Jewett's testimony that the description provided by D.A.J. to his father was consistent with D.A.J.'s demonstration to Gully and Jewett.

We have determined, however, that testimony regarding the demonstration, though hearsay, was admissible as an excited utterance.

As a result, even if the hearsay issue related to the demonstration had been preserved, it would not be meritorious.

That leaves, of course, the hearsay statement offered by the father regarding what his son told him. When Dessinger objected to out-of-court statements by D.A.J. to Gully, the district court sustained the objection. Unlike where an objection is overruled by a district court, when an objection to hearsay is sustained, the objection must be repeated on each successive offer of evidence. *Compare Padgett,* 300 N.W.2d at 146, *with Hariri,* 465 N.W.2d at 548–49. On the question of whether any verbal statements by D.A.J. to his father are hearsay, Dessinger's counsel posed no contemporaneous objection. Therefore, the evidentiary objection has not been preserved.

**D. Admissibility of Officer Samuelson's Testimony Regarding D.A.J.'s Hearsay Statements as an Explanation of Police Officer Conduct.** The rule prohibiting hearsay evidence only forbids an out-of-court statement used "to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(*c*). So, when the out-of-court statement is used to prove something other than the truth of the matter asserted, such as responsive conduct, the statement may be admissible as nonhearsay. *See State v. Mitchell,* 450 N.W.2d 828, 832 (Iowa 1990). However, "the court must determine whether the statement is truly relevant to the purpose for which it is being offered, or whether the statement is merely an attempt to put before the fact finder inadmissible evidence." *Id.*

Several times we have rejected the use of out-of-court statements because they "explained responsive conduct of law enforcement officers." *State v. Plain,* 898 N.W.2d 801, 812 (Iowa 2017) (providing the example of *State v. Tompkins* where the officer's testimony was inadmissible because

the officer's account "went beyond the mere fact that a conversation occurred and instead actually stated what the witness said. . . . [and] did not merely explain the investigation" and instead directly challenged the defense's argument. (quoting *State v. Tompkins*, 859 N.W.2d 631, 636, 643 (Iowa 2015))). We have also expressed concern that when an "investigating officer specifically repeats a victim's complaint of a particular crime, it is likely that the testimony will be construed by the jury as evidence of the facts asserted." *State v. Elliott*, 806 N.W.2d 660, 667 (Iowa 2011) (quoting *State v. Mount*, 422 N.W.2d 497, 502 (Iowa 1988), *overruled on other grounds by State v. Royer*, 436 N.W.2d 637, 639–40 (Iowa 1989)). We have further explained that:

> [T]he arresting or investigating officer will often explain his going to the scene of the crime or his interview . . . by stating that he did so "upon information received" and this of course will not be objectionable . . . but if he becomes more specific by repeating definite complaints of a particular crime by the accused, this is so likely to be misused by the jury as evidence of the fact asserted that it should be excluded as hearsay.

*State v. Doughty*, 359 N.W.2d 439, 442 (Iowa 1984) (quoting *McCormick's Handbook of the Law of Evidence* § 248, at 587 (Edward W. Cleary ed., 2d ed. 1972)).

In this case, Officer Samuelson testified that on the day of the alleged event, D.A.J.'s parents came to the police station and "reported that their child was at Tracey's Tots, goes there for daycare, and the child had been picked up and then put down. So basically a form of abuse that occurred from one of the workers at Tracey's Tots." Officer Samuelson said that this report prompted him to conduct an investigation in which he interviewed Gully, Dessinger, and Jewett.

In fact, Officer Samuelson had no personal knowledge of the events at Tracey's Tots. He had nothing to contribute to fact-finding. He was

simply a vehicle for the delivery of hearsay information. Officer Samuelson's testimony was therefore inadmissible.

Nonetheless, it is not clear from the record whether Dessinger's counsel had a strategic purpose for permitting the Samuelson testimony. First, it gave Dessinger an opportunity to conduct cross-examination on what the officer was told or observed, thereby giving Dessinger the opportunity to attempt to develop inconsistencies or other helpful testimony. Dessinger's counsel elicited from Officer Samuelson the suggestion that Jewett's statement to him was limited and that he did not agree with witnesses who testified that they heard D.A.J. screaming and yelling. Counsel may have concluded that any direct harm from Officer Samuelson's testimony at trial was minimal as the jury would have concluded even without his testimony that the police must have had a belief that the abuse occurred or the charges in the case would not have been filed. Counsel may have concluded that the potential benefits of cross-examination outweighed the harm of Officer Samuelson's direct testimony. In terms of damage from his direct testimony, in this regard, it is noteworthy that Officer Samuelson was not an expert witness vouching for the veracity of a witness but was simply a police officer engaging in an investigation.

Finally, as the State points out, Dessinger's counsel wished to use the fact that the Iowa Department of Human Services (DHS) had determined that the complaint was unfounded. If counsel objected to Officer Samuelson's testimony, it is conceivable he might have believed he would jeopardize his position on the admissibility of the favorable DHS action.

As a result, we are not prepared to say at this stage that counsel was ineffective. We of course take no view on the merits of such a claim

without a fully developed record. If the issue is to be resolved it must be in a proceeding for postconviction relief. *See State v. Clay*, 824 N.W.2d 488, 500–01 (Iowa 2012).

## IV. Confrontation Clause Issue.

Dessinger argues that her Confrontation Clause rights were violated because testimonial statements made by D.A.J. were admitted into evidence through the testimony of Jewett and Gully, and Dessinger was not given the opportunity to cross-examine D.A.J. regarding the statements. Dessinger mentioned the issue in her motion in limine and her challenge to D.A.J.'s competency. Before trial, the district court determined that statements recited by witnesses without first-hand knowledge would not be permitted unless a hearsay exception applied. The district court did not explicitly rule on the Confrontation Clause issue, and the issue was never objected to at trial.

"Ordinarily, error claimed in a court's ruling on a motion in limine is waived unless a timely objection is made when the evidence is offered at trial." *State v. Tangie*, 616 N.W.2d 564, 568 (Iowa 2000) (en banc). But, when the

> motion in limine is resolved in such a way it is beyond question whether or not the challenged evidence will be admitted during trial, there is no reason to voice objection at such time during trial. In such a situation, the decision on the motion has the effect of a ruling.

*State v. Miller*, 229 N.W.2d 762, 768 (Iowa 1975). Because the district court did not explicitly rule on the Confrontation Clause issue in response to Dessinger's motion in limine and there was no Confrontation Clause objection when the evidence was presented at trial, the issue was not raised during the trial, and the district court never made a ruling on the issue. We therefore find that the issue was not preserved.

**V. Ineffective Assistance.**

Dessinger argues ineffective assistance of counsel in three ways: first, counsel failed to raise hearsay objections regarding D.A.J.'s verbal statements; second, counsel failed to raise Confrontation Clause objections; and third, counsel failed to object to testimony from Officer Samuelson concerning his opinion on whether the allegation that D.A.J. had been abused was credible.

As discussed above, we found the hearsay statements by D.A.J. to be admissible under the excited utterance exception, therefore, counsel was not required to object to the admissible hearsay statements. We find counsel's failure to object to the hearsay statements was not ineffective assistance of counsel.

On the Confrontation Clause issue, counsel failed to object to any potential Confrontation Clause issue during trial. However, on the record, we do not have enough information about why counsel decided against objecting to the issue. When the record is not fully developed and the claim involves matters of trial strategy or tactics, we typically, "prefer to reserve [those] questions for postconviction proceedings." *State v. Tate*, 710 N.W.2d 237, 240 (Iowa 2006); *see also Clay*, 824 N.W.2d at 500–01 ("Until the record is developed as to trial counsel's state of mind, we cannot say whether trial counsel's failure to object implicated trial tactics or strategy."); *State v. Rubino*, 602 N.W.2d 558, 563 (Iowa 1999). Here, the question is whether the statements of a four-year-old child should be considered testimonial. *See In re J.C.*, 877 N.W.2d 447, 452–58 (Iowa 2016). Further, although Dessinger lodged a pretrial objection to the competency of D.A.J. to testify, counsel may have been sufficiently satisfied with the developing trial record that the Confrontation Clause issue was not pursued. We, therefore, believe that the ineffective-

assistance-of-counsel claim on the Confrontation Clause issue would be best suited for postconviction-relief proceedings where the record can be more fully developed, and counsel may defend against the claim.

On the issue of counsel's failure to object to opinion testimony given by Officer Samuelson, because we do not know from the record why trial counsel decided not to object, the record must be more fully developed before deciding the issue. Therefore, we also preserve this issue for postconviction-relief proceedings.

### VI. Reasonable Ability to Pay.

Dessinger's hearing before the sentencing court was on November 19, 2018. On the same day, the district court entered Dessinger's sentencing order. The sentencing order stated that the "[d]efendant shall pay . . . court-appointed attorney fees of $0.00; and . . . the court costs of this action." The general combined docket listed court costs of $323. Dessinger filed her notice of appeal on December 10, 2018.

When imposing restitution for items such as court costs, district courts are bound by the reasonable-ability-to-pay determination required by Iowa Code section 910.2A (2021). In the time since Dessinger's appeal, the legislature enacted Senate File 457 (S.F. 457) which changed the criminal restitution framework. *See* 2020 Iowa Acts ch. 1074, §§ 65–83. S.F. 457 made a number of changes to the scheme for a defendant's ability to pay category "B" restitution, which includes court costs. *Id.* § 72 (codified at Iowa Code § 910.2A (2021)). While the S.F. 457 provisions concerning restitution took effect on June 25, 2020, the legislature also addressed any pending reasonable-ability-to-pay cases under the previous *Albright* framework by enacting Iowa Code section 910.2B. 2020 Iowa Acts ch. 1074, §§ 73, 83 (codified at Iowa Code § 910.2B (2021)). S.F. 457 states that if a restitution order is "entered by a district court prior to the effective

date of this Act, [it] shall be converted to [a] permanent restitution order." *Id.* § 73 (codified at Iowa Code § 910.2B(1) (2021)). The amendment specifically included "restitution order[s] that do[] not contain a determination of the defendant's reasonable ability to pay the restitution ordered." *Id.* (codified at Iowa Code § 910.2B(1)(*c*) (2021)).

Under the new statutory scheme, a defendant who believes he is unable to pay category "B" restitution must request that the district court conduct a reasonable-ability-to-pay analysis. Iowa Code § 910.2A(2). The defendant must request the hearing at sentencing or within thirty days of the district court entering the permanent restitution order or is subject to the full payment of category "B" restitution. *Id.* § 910.2A(3)(*a*). Failure to timely request the hearing waives all future reasonable-ability-to-pay claims unless they come through a petition to the district court under section 910.7. *Id.* § 910.2A(3)(*b*).

In *State v. Hawk,* we considered a challenge to the defendant's reasonable ability to pay under the new statutory framework. 952 N.W.2d 314, 318–19 (Iowa 2020). There we determined that a district court reasonable-ability-to-pay determination was appropriate when it ordered the defendant to pay a specific amount of court costs and capped the defendant's obligation to pay attorney fees at $250. *Id.* Here, the district court found that Dessinger had no reasonable ability to pay attorney fees and assessed $0 in attorney fees. However, the district court did not conduct a reasonable-ability-to-pay determination on the court costs or correctional fees. Unlike *Hawk,* the district court did not assess specific amounts of court costs or correctional fees but still ordered Dessinger to pay "the court costs of this action."

The State argues that because the fees have not yet been assessed, Dessinger's argument is premature. However, Iowa Code section 910.2B

converts all temporary restitution orders without a reasonable-ability-to-pay determination which were entered prior to June 25, 2020, into permanent restitution orders. Dessinger's restitution order was entered on November 19, 2018. Since the order was entered prior to June 25, 2020, the order is converted into a permanent order under section 910.2B. Dessinger's reasonable-ability-to-pay challenge is ripe under S.F. 457.

Applying the new framework, Dessinger must first exhaust remedies before the district court before launching an appeal of a restitution order. Dessinger, however, did not have an opportunity to seek relief before the district court since the statute was not in effect at the time of the entry of the restitution order in this case. Under the circumstances, we think the proper resolution of Dessinger's appeal of the restitution order is to remand the case to the district court with instructions to allow Dessinger to follow the procedures required by section 910.2A and then hold a hearing under Iowa Code section 910.7 on the remaining restitution issues in this case.

## VII. Conclusion.

For the foregoing reasons, we affirm the decision of the court of the appeals on the hearsay issue to the extent that the admission of the hearsay evidence was not prejudicial to Dessinger, and we affirm the court of appeals decision in regard to the Confrontation Clause issue not being preserved on appeal. We vacate the decision of the court of appeals preserving the ineffective-assistance-of-counsel claim regarding the hearsay issues, but affirm the decision as to the preservation of the ineffective-assistance-of-counsel claims for postconviction relief related to the Confrontation Clause and opinion testimony of Officer Samuelson. Finally, we affirm the decision of the court of appeals regarding the restitution issues and remand the case to the district court to provide

Dessinger the opportunity to obtain a determination of her ability to pay restitution consistent with this opinion.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED, SENTENCING ORDER AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED FOR RESENTENCING.**