**STATE of Iowa, Appellee,**

v.

**Dwight MURRAY, Appellant.**

No. 92–1785.

Supreme Court of Iowa.

Feb. 23, 1994.

Linda Del Gallo, State Appellate Defender, and Kevin Cmelik, Asst. Appellate Defender, for appellant.

Bonnie J. Campbell, Atty. Gen., Amy M. Anderson, Asst. Atty. Gen., Denver D. Dillard, County Atty., and Jerry Vander Sanden, Asst. County Atty., for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, SNELL, and TERNUS, JJ.

CARTER, Justice.

Defendant, Dwight Murray, appeals from his conviction of first-degree murder in connection with his alleged bludgeoning of Blanche Gloe, who subsequently died. The case presents substantial issues of legal causation that have arisen because of the fact that the comatose victim's death from pneumonia occurred subsequent to the time that a medical decision was made for cessation of antibiotics and nourishment. The appeal also presents issues concerning the giving of an aiding and abetting instruction and the admission of testimony given at a prior trial by an allegedly unavailable witness. After considering all of the issues presented, we affirm the judgment of the district court.

On March 23, 1991, Nick Gloe went to his mother's house to help her with some book work concerning some apartment units locat-

ed on the corner of Second Avenue and Fourteenth Street in Cedar Rapids. Blanche Gloe, Nick's eighty-one-year-old mother, was not home when he arrived. Upon entering the house, Nick found evidence of a break-in. He noticed a number of items were missing from the house, including some jewelry, two television sets, some cash, and a sewing machine.

While the police were investigating the break-in at Blanche's house, Nick's son, Chris Gloe, looked for Blanche at the apartment units that she owned and operated. Upon reaching the apartment units, Chris noticed that Blanche's car, which had not been at her residence, was also not parked at the apartments. He reported that fact to his father. Nick then asked Chris to make a further search for Blanche at the apartment units and to make inquiries of the tenants. In undertaking that search, Chris found Blanche in a basement office of the apartment building, lying in a pool of blood, partially wrapped in a piece of carpet.

Emergency medical technicians at the scene initially concluded that Blanche Gloe was dead. However, a police officer heard her make a small moan. It was then determined that she did have a pulse, and she was immediately transported to a hospital. The emergency room physician was the first doctor to examine Blanche. He found her unconscious but breathing on her own. She had a pulse and a blood pressure, and her skull, under a laceration, was fractured with a subdural hematoma pressing on her brain.

Dr. James LaMorgese, a neurological surgeon, then became Blanche's treating physician. He determined that there was no functioning in the cerebral hemisphere and that there was functioning from the midbrain down. Surgery was undertaken to remove the blood clot, protect the brain, and close the scalp. Blanche survived the operation and improved to the point that a respirator was removed. Because she did not regain consciousness, a feeding tube was implanted in her abdominal wall.

Although Blanche remained stable physically, neurologically she did not improve over the next fourteen weeks and thereafter. After extensive discussions with and consent from her family, Dr. LaMorgese began, some fourteen weeks after Blanche's bludgeoning, to reduce the calories provided through the feeding tube and to withhold medication, including antibiotics. This decision was made after Dr. LaMorgese concluded and advised her family that Blanche was not going to improve and would eventually die from pneumonia or a bladder infection.

The calories were decreased in stages until finally, on November 5, 1991, nearly thirty weeks after the initial injury, no calories were supplied. Blanche eventually died on December 10, 1991.

Initially, Murray was convicted of robbery in the first degree and burglary in the second degree. The robbery charge involved the same conduct for which he has now been convicted of murder. Blanche Gloe was comatose but living at the time of his trial on those offenses. After Blanche Gloe died, Murray was charged with murder in the first degree, committed during the commission of a felony, robbery in the first degree.

The evidence offered at defendant's murder trial to establish his perpetration of the bludgeoning of the victim included the following. Blanche Gloe's missing car was found in a parking lot of a local business. Eyewitness testimony was presented that defendant was seen driving that automobile at a time subsequent to the crime. A search of the area where defendant had been seen with the automobile revealed Blanche Gloe's billfold concealed in some trash in the vicinity. In addition, a witness testified that defendant was seen in possession of rings that matched the description of those taken from Blanche Gloe. A vehicle matching the description of one owned by defendant's girlfriend and that he sometimes used was seen in the vicinity of Blanche Gloe's home within the time frame of the perpetration of the burglary at that location. A pair of tennis shoes taken from defendant bore tread marks the design of which was consistent with bloody footprints found at the scene of the crime.

I. *The Legal Causation Issues.*

At the close of the State's evidence, Murray moved for a judgment of acquittal based upon the failure of the State to prove the

causal chain between Murray's action and the victim's death. Specifically, Murray alleged that the decision to terminate Blanche's feeding and medication was an intervening and superseding cause. The motion was denied. Murray's argument on this issue is based on the role of Blanche's treating physician as an intervening cause. Murray maintains that an act of gross negligence may be necessary to interrupt the chain of causation. He argues that the intentional act in this case of cutting off nutrition and medication to a patient who is comatose but alive rises to the level of gross negligence.

Murray urges that there is no case law or statutory support in Iowa for the decision to discontinue nutrition and medication to a living patient. He contends that, because no one had the authority to discontinue medication and nutrition under either Iowa Code section 235B.1(2)(b) (1991) or Iowa Code section 144A.2(8) (1991), the doctor did not possess authority, and his actions should thus be characterized as grossly negligent.

■ We think it is far from being established that the decision for cessation of medication and nourishment was negligently made. Irrespective of our conclusion on that point, the theory upon which defendant relies is not legally sound. As we stated in *State v. Inger*, 292 N.W.2d 119 (Iowa 1980), "[i]t is well established that ordinarily negligent treatment or neglect of an injury will not excuse a wrong done unless the treatment or neglect was the sole cause of death." *Id.* at 125.

In the present case, the medical decisions that preceded the victim's death were the product of the physical condition in which the victim had been placed as a result of her assailant's blows. Consequently, those medical decisions were part of a chain of events set in motion by the assailant's act and leading directly to the victim's death. The evidence strongly supported a finding that, but for the assault defendant made upon her, Blanche Gloe would still have been alive for some time beyond the date of her demise. The fact that she was not alive was a direct consequence of the injuries sustained in the brutal attack upon her. That is sufficient to render the attack a legal cause of her death.

The recent decision of a federal court contains a helpful discussion of the principles to be applied in deciding legal causation issues in homicide situations similar to the one now before the court. In that case, the federal court of appeals stated that:

> [A]n act is a cause of an event if two conditions are satisfied: the event would not have occurred without the act; the act made the event more likely. The first condition is necessary to distinguish the attempted from the completed crime, the second to rule out cases in which, while the event in question would not have occurred but for the act, the act did not create the kind of dangerous condition that would make such events more likely to occur.

*Brackett v. Peters*, 11 F.3d 78, 79 (7th Cir. 1993). In applying these principles to the case before it, the federal court found in a homicide prosecution that an assault on an eighty-five-year-old woman was a legal cause of her death, which occurred when food administered through a feeding syringe lodged in her trachea. Use of the feeding syringe was made necessary by the injuries that she sustained in the assault.

We conclude that the statement of principles in the *Brackett* case accurately states the law that controls the issue now before the court and that, based on the evidence, a rational trier of fact could conclude that both of the conditions required for a finding that defendant's actions were a legal cause of Blanche Gloe's death were met.

■ Also dealing with the issue of legal cause is Murray's contention that the district court erred in not giving an intervening and superseding cause instruction to the jury. There was no error in this regard. We have recognized that principles of causation normally associated with civil tort litigation have a proper application in criminal cases. *See State v. McFadden*, 320 N.W.2d 608, 612–13 (Iowa 1982); *State v. Marti*, 290 N.W.2d 570, 585–86 (Iowa 1980). Under accepted principles of civil tort law, rules that restrict an actor's responsibility under theories of superseding cause are for the court to apply rather than the jury. Restatement (Second) of Torts § 453 (1965). The governing princi-

ple in deciding whether the medical decisions in the present case could be a superseding cause is covered by another section of the Restatement. That section provides:

> The intervention of a force which is a *normal consequence* of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about.

Restatement (Second) of Torts § 443 (1965) (emphasis added). The interpretive comment to the above section with respect to what is a "normal" consequence states that:

> The word "normal" is not used in this Section in the sense of what is usual, customary, foreseeable, or to be expected. It denotes rather the antithesis of abnormal, of extraordinary. It means that the court or jury, looking at the matter after the event, and therefore knowing the situation which existed when the new force intervened, does not regard its intervention as so extraordinary as to fall outside of the class of normal events.

*Id.* cmt. b. Judged by this standard, we conclude that the medical decisions for cessation of medication and nourishment were as a matter of law normal consequences of the situation created by Murray's criminal conduct. There was no basis for instructing the jury with respect to a superseding cause.

## II. *The Aiding and Abetting Instruction.*

Defendant also complains on appeal that the district court erred in overruling his objection to the giving of an aiding and abetting instruction. The district court believed and we agree that there was some evidence that more than one person participated in either the assault, the burglary of Blanche Gloe's home, or both of those crimes. Because that evidence was present and because defendant's identity as the deliverer of the fatal blow was not established by direct evidence, the State was entitled to have the jury instructed on a theory of aiding and abetting. Under that legal theory, defendant's guilt would not depend on proof as to which of the parties, if there were more than one, delivered the blow that caused the victim's death.

## III. *The Admission of Testimony From a Former Trial Given by an Allegedly Unavailable Witness.*

Finally, defendant complains that the district court erred in permitting the State to read into evidence the testimony given by witness Cheri Jolin from defendant's burglary and robbery trial. This was permitted based on the State's contention that they were unable to locate this witness in order to serve a subpoena on her for the murder trial. Defendant contends that the record fails to show that the State made a "good-faith effort" to secure the witness's presence at the murder trial. We disagree.

Under rule 804(b)(1) of the Iowa Rules of Evidence, testimony from a prior trial may be read to the jury in a later proceeding if the witness is then unavailable and if the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. Cheri Jolin was vigorously cross-examined by defendant's counsel at his robbery and burglary trial. The use of prior trial testimony in a later criminal case under rule 804(b)(1) does not violate the confrontation clause of the Sixth Amendment to the Federal Constitution if the prosecuting authority has made a reasonable effort to secure the witness's presence. *Ohio v. Roberts,* 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597, 613 (1980).

An investigator for the Linn County Attorney's Office testified as to the efforts that were made to locate Cheri Jolin. He stated that he had been given a subpoena to serve upon her several weeks before the trial began. He attempted to locate her at two former addresses known to him in the State of Iowa. In the process, he deduced from friends of the witness that she was in the State of Wisconsin. He testified that he was not able to locate an address for her in that state. He had attempted to trace her through her boyfriend, whom he believed was incarcerated in Wisconsin but who he later learned had bonded out and left the area. When that avenue proved fruitless, a material witness warrant was issued, but Wisconsin authorities had not been able to

execute that warrant at the time of defendant's trial.

Although defendant's appellate counsel seeks to second-guess the efforts that were undertaken to locate this witness, much of the resulting criticism rests in speculation and did not find support in the cross-examination of the county attorney's investigator. We conclude, as did the district court, that the State made a reasonable effort to locate Cheri Jolin and, because that effort proved unsuccessful, was entitled to read into evidence her testimony from the prior trial.

We have considered all arguments presented on this appeal and conclude that the judgment of the district court should be affirmed.

**AFFIRMED.**