**STATE of Iowa, Appellee,**

v.

**Alejandro Albarran GARCIA, Appellant.**

No. 98–2089.

Supreme Court of Iowa.

Sept. 7, 2000.

Patricia M. Hulting of Roehrick, Hulting, Krull & Blumberg, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, John P. Sarcone, County Attorney, and Steve Foritano and Frank Severino, Assistant County Attorneys, for appellee.

LARSON, Justice.

Alejandro Garcia was convicted in a jury-waived trial of first-degree murder under Iowa Code sections 707.1, 707.2(1), and 707.2(2) (1997). He appealed, and the court of appeals reversed. We granted the State's application for further review and now vacate the decision of the court of appeals and affirm the judgment of the district court.

### I.  *Facts and Prior Proceedings.*

We recite the facts in the light most favorable to the verdict. Garcia and four others were hired for $100 each to beat up an individual named Daniel Hernandez Gonzales (Hernandez), who allegedly owed money for drugs. The four of them drove to the victim's home armed with a metal baseball bat, beer bottles, and a gun "just in case" Hernandez was armed. Garcia, with the gun and baseball bat, broke into the victim's trailer home and pushed him down on the couch. Three others followed, while another man remained in the vehicle. Garcia hit Hernandez with the baseball bat, and the others hit him with beer bottles. The victim was able to get loose and run outside. His attackers followed him and began kicking him. When the victim got up, Garcia shot him four times. Garcia and the others fled the scene but were soon apprehended.

The victim was immediately taken to a hospital. Two bullets had struck him in the leg and were not life threatening. The other two wounds would have been fatal without immediate medical attention. One bullet had entered his abdomen and pierced his stomach, liver, and left lung, coming to rest just outside his rib cage. Dr. Francis Garrity, the Polk County Medical Examiner, characterized this wound as "very serious" and would have resulted in the victim's death if not treated. The other wound was from a bullet that grazed the victim's aorta and perforated both lungs. This wound would also have resulted in death if not treated.

Doctors performed surgery on the victim's abdomen and chest. During surgery, there were problems in repairing the holes in the victim's stomach, and gastric contents spilled into the belly area. During surgery on his lower left lung, doctors were forced to remove a substantial portion of the lung.

As a result of the trauma to his lungs, the victim developed Adult Respiratory Disease Syndrome (ARDS), a serious condition that results in death in forty to eighty percent of adult cases. With this condition, the lung becomes so dysfunctional that oxygen is unable to properly move from the airways to the blood stream, requiring the use of mechanical devices such as ventilators. The victim was placed on a ventilator when he was no longer able to breathe on his own. As part of his treatment, he was also placed on a large quantity of fluids, causing him to develop severe swelling. Prior to his death, the victim's condition was steadily and rapidly deteriorating, with a number of organ systems failing.

While the victim was hospitalized and while he was being shaved by a hospital employee, a tracheotomy tube used to con-

nect him to the ventilator was nicked, and the attending physician decided to change the tube to increase the efficiency of the oxygen getting into the lungs. Due to the victim's swollen neck, as the tube was being changed, his airway closed and the attending physician was unable to replace the tube. As a result, the victim asphyxiated. One doctor believed the victim would have died anyway, notwithstanding the tube change, within three or four days. It was this doctor's opinion that the gunshot wounds were the proximate cause of the victim's death and that the medical decisions relating to treatment were part of a chain of events set in motion by the wounds.

Garcia and the others were charged with first-degree murder. Prior to trial, Garcia moved to suppress a letter purportedly written by him while in jail. The letter, written by Garcia to the brother of one of Garcia's codefendants, was intercepted by the codefendant's mother, who gave it to her son's attorney. The letter ultimately reached the State. Garcia moved unsuccessfully to suppress the letter.

As the trial date approached, the State filed a motion for adjudication of law points and a motion to exclude evidence that medical treatment, characterized by Garcia as grossly negligent, was an intervening and superseding cause of the victim's death. The court sustained the State's motion and found as a matter of law that the medical treatment was not a superseding cause of death.

Garcia was tried to the bench and convicted. He appealed, raising as issues the district court's ruling that prevented him from introducing evidence of superseding cause and the court's refusal to suppress the letter.

## II. *The Ruling Prohibiting Introduction of Evidence of Intervening Cause.*

Garcia argues the district court denied him due process of law by depriving him of a defense to which he was entitled. In an offer of proof his expert, Dr. Lawrence Repsher, testified that the doctors' actions in removing the tracheotomy tube from the victim was the cause of his death. Garcia argues this creates a jury question as to causation and that the district court erred in ruling prior to trial that he could not present this evidence. This is the basis on which the court of appeals reversed.

Pursuant to Iowa Rule of Evidence 104(a), the court held a hearing on the admissibility of evidence as to intervening and superseding causes of death. Although Dr. Repsher testified that the victim's death was caused by incompetent medical treatment, the district court held that, even if that were true, it would not "vitiate a causal nexus between the risk [of incompetent treatment] and the act which created it, the shooting." Citing Dr. Repsher's testimony, the court stated that "reasonable minds would not differ in concluding that both the medical decision and the shooting [were] contributing causes to the death of [the victim]." The court held because the removal of the tracheotomy tube was not the sole proximate cause of death, a defense of intervening and superseding cause was not relevant and Garcia could not call Dr. Repsher as an expert witness to establish that defense.

■ The principles of causation normally associated with civil tort litigation are pertinent in criminal cases. *State v. Murray*, 512 N.W.2d 547, 550 (Iowa 1994). The rules restricting an actor's responsibility under theories of superseding cause are for the court to apply and not the jury. *Id.* In determining the legal cause of death, we have endorsed the following principle:

> [A]n act is a cause of an event if two conditions are satisfied: the event would not have occurred without the act; [and] the act made the event more likely. The first condition is necessary to distinguish the attempted from the completed crime, the second to rule out cases in

which, while the event in question would not have occurred but for the act, the act did not create the kind of dangerous condition that would make such events more likely to occur.

*Id.* (quoting *Brackett v. Peters,* 11 F.3d 78, 79 (7th Cir.1993)).

A defendant can be relieved of criminal responsibility if an intervening act breaks the chain of causal connection between the defendant's actions and the victim's death. *State v. Wissing,* 528 N.W.2d 561, 565 (Iowa 1995). However, for an intervening act to relieve a defendant of criminal responsibility for homicide, the intervening act must be the *sole* proximate cause of death. *Id.* In deciding whether medical treatments are superseding causes, we have stated:

"The intervention of a force which is a *normal consequence* of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about."

*Murray,* 512 N.W.2d at 551 (quoting Restatement (Second) of Torts § 443 (1965)).

In the pretrial evidentiary hearing, Dr. Repsher's opinion as to the cause of death was that it was the result of medical negligence. In fact, he had harsh words for the treatment rendered the victim. Referring to the removal of the tracheotomy tube, he said

it was outrageous. I mean it was— there was just no—absolutely no reason to do it and all sorts of reasons not to do it. I mean it was just extraordinary.

At another point, the witness testified that removal of the tracheotomy tube (which apparently everyone agrees caused the victim to asphyxiate) was "completely irrational." On cross-examination, however, the doctor agreed the gunshot wounds were sufficient in themselves to cause death in the absence of medical intervention.

The defendant relies on Restatement (Second) of Torts section 443, quoted above, stating that an intervening force that is a "normal consequence" of a defendant's act cannot be a superseding cause of death. In this case, however, the intervening act was not normal according to the defendant; it was "outrageous," and due process demands he be allowed to present it as a defense.

As the Supreme Court has said,

[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967).

The question is whether Garcia's superseding-cause defense is one recognized in our law under the facts of this case. He acknowledges several of our cases holding that medical care furnished a crime victim cannot be a superseding cause of death but distinguishes them on the basis they involved ordinary negligence, not gross negligence as he claims here. *See, e.g., Murray,* 512 N.W.2d at 551 (death of comatose victim following withholding of nourishment and medication held as a matter of law to be normal consequence of criminal assault); *Davis v. State,* 520 N.W.2d 319, 320 (Iowa App.1994) (placement of feeding tube in victim resulting in bacterial peritonitis and death held to be normal consequence of stabbing).

The defendant cites no cases holding that gross negligence may constitute a superseding cause under the facts of this case. However, in a case not cited by the defendant, the New York Court of Appeals

suggested such a rule in dictum. *See People v. Eulo*, 63 N.Y.2d 341, 482 N.Y.S.2d 436, 472 N.E.2d 286 (1984). The court said:

If victims' deaths were prematurely pronounced due to a doctor's negligence, the subsequent procedures [removal of organs for transplant] may have been a cause of death, but that negligence would not constitute a superseding cause of death relieving defendants of liability. *If, however, the pronouncements of death were premature due to the gross negligence or the intentional wrongdoing of doctors, as determined by a grave deviation from accepted medical practices or disregard for legally cognizable criteria for determining death, the intervening medical procedure would interrupt the chain of causation and become the legal cause of death.* Thus, the propriety of the medical procedures is integral to the question of causation.

*Id.* at 297 (citations omitted) (emphasis added). This dictum in *Eulo* was later discussed and impliedly rejected by the New York court, which held that even gross negligence is insufficient to relieve a defendant from criminal liability unless the treatment is the sole cause of death. *See People v. Griffin*, 80 N.Y.2d 723, 594 N.Y.S.2d 694, 610 N.E.2d 367 (1993). After discussing the dictum in *Eulo*, the court reaffirmed its traditional rule in such cases by saying:

The test for relief from criminal responsibility for a death applicable to the facts of this case remains whether the death can be attributed solely to the negligent medical treatment.

*Griffin*, 594 N.Y.S.2d 694, 610 N.E.2d at 369.

The facts of *Griffin* are strikingly similar to the facts in the present case. In *Griffin*, as here, the issue was whether the trial court erred in excluding evidence of medical malpractice as a superseding cause of death. In *Griffin* the victim of the stabbing developed complications during treatment, including ARDS, as in this case. The defense attempted to introduce evidence that medical malpractice was a superseding cause of death. The court held that medical malpractice, even if gross, must be the sole cause of death to be a superseding cause. As a matter of law, the malpractice was held not to be the sole cause of death. *Id.*

Other cases that have addressed the issue leave no doubt about the legal principle to be applied: even gross negligence will not relieve a criminal actor of liability unless it is the sole cause of death. A recent Connecticut case reaffirmed that principle. In *State v. Shabazz*, 246 Conn. 746, 719 A.2d 440 (1998), *cert. denied*, 525 U.S. 1179, 119 S.Ct. 1116, 143 L.Ed.2d 111 (1999), the defendant was charged with stabbing a victim to death. He relied on the defense of intervening medical malpractice and asserted that the medical treatment was grossly negligent. He attempted to use a physician who specialized in anatomic, clinical, and forensic pathology, who testified to that effect. The Connecticut court held that the trial court properly refused to allow that evidence because no rational fact finder could conclude the intervening medical treatment, even if grossly negligent, was the sole cause of death. *Shabazz*, 719 A.2d at 444.

This is consistent with the general rule. *See* Carolyn Kelly MacWilliam, Annotation, *Homicide: liability where death immediately results from treatment or mistreatment of injury inflicted by defendant*, 50 A.L.R.5th 467 (1997).

In that annotation, the author observed:

A person who inflicts a mortal or dangerous wound upon another is generally held criminally liable for the victim's resulting death, even in those instances where medical negligence or mistreatment also contributed to the victim's death. The courts have recognized a defense to a charge of homicide only when the treating physician has acted in a grossly negligent manner *and that*

*gross medical negligence was the sole cause of the victim's death.*

*Id.* at 467 (emphasis added); *see also* 40 Am.Jur.2d *Homicide* § 18, at 468–69 (1999):

> Negligent treatment or neglect of an injury will not excuse a wrongdoer unless the treatment or neglect was the sole cause of death; gross maltreatment by attending physicians or surgeons which was the sole cause of the alleged victim's death is a good defense to a charge of homicide. It has also been said that, in order to avoid liability, the defendant must show that erroneous or unskilled medical care became the efficient intervening cause of death and superseded the effect of the wounds inflicted by the defendant so as to become the proximate cause of death.

Obviously, under this restrictive rule of proximate cause, it will be a rare case in which a criminal defendant is relieved from responsibility for the death of the victim, based on intervening medical care. However, one case illustrates when intervening medical treatment *can* break the connection between the criminal act and the death. *See People v. Stewart,* 40 N.Y.2d 692, 389 N.Y.S.2d 804, 358 N.E.2d 487 (1976). In that case, during medical treatment for a knife wound, surgeons discovered the victim also had an incarcerated hernia. After they sutured the knife wound and completed surgery on the victim's stomach, they proceeded to correct the hernia. The patient died. The autopsy report stated death was caused by

> a stab wound of the abdomen, stomach, cardiac arrest during surgical correction of a stab wound *and another operation which was indicated during the surgical procedure* with sepsis, which means infection, and kidney shut down.

*Id.* at 490 (emphasis added). Because treatment for the hernia was not necessitated by the criminal attack, the court held the prosecution had failed to show the cause of death was the knife wound, and it

ordered the manslaughter conviction to be reduced to assault. *Id.* at 492.

In the present case, the trial court properly ruled that evidence of malpractice, even if it was "outrageous" as the defendant's witness testified, was inadmissible. No reasonable fact finder could conclude the medical treatment was the sole proximate cause of death. In fact, the defendant's own witness testified it was not. We therefore affirm the district court on this issue.

### III. *The Letter From Jail.*

■ Garcia's second issue concerns a letter he mailed from jail to the brother of a codefendant. The letter was highly inculpatory because in it he attempted to get the codefendant to lie for him by saying Garcia shot the victim in self-defense. The codefendant's mother, who received the letter, took it to attorney Melissa Anderson of the Des Moines Adult Public Defender's Office, who represented another defendant, Jamie Mendoza. Anderson eventually turned it over to prosecutors.

Garcia filed a motion in limine seeking to suppress the letter on the ground Anderson was his lawyer and that, by turning the letter over to the State, she breached their attorney-client relationship. (He did not claim the letter was privileged because it was sent to the codefendant's brother, not to Anderson.) The district court denied the motion in limine, and although the evidence was not used at trial, Garcia raises this as an issue on appeal.

We reject his argument for two reasons. First, at the time Anderson received the letter she was not Garcia's lawyer. While she had represented him earlier in an unrelated case, she had withdrawn before she received the letter. Second, Garcia could not claim prejudice because the State never introduced the letter into evidence. Apparently, the State held it in the event Garcia testified. He did not testify. Garcia does not claim, as the defendant did in *State v. Brown,* 569 N.W.2d 113 (Iowa

1997), that the state's possession of damaging evidence chilled his right to testify because he feared the evidence would be brought out on cross-examination. *See Brown,* 569 N.W.2d at 118.

We vacate the decision of the court of appeals and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except NEUMAN, J., who takes no part.