# IN THE COURT OF APPEALS OF IOWA

No. 22-0522
Filed August 30, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DEREK MICHAEL WHITE,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Osceola County, Shayne Mayer, Judge.


        A defendant appeals his convictions for one count of neglecting a dependent person and two counts of child endangerment.  **AFFIRMED.**


        Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold, Assistant Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Genevieve Reinkoester and Susan Krisko, Assistant Attorneys General, for appellee.


        Considered by Bower, C.J., and Tabor and Greer, JJ.

**TABOR, Judge.**

During an unannounced visit to D.C.'s home, a social worker found the two-year-old's face and neck covered with bruises in different stages of healing. After police investigated those injuries, the State charged his mother's live-in boyfriend, Derek White, with neglect of a dependent person and two counts of child endangerment. A jury convicted White on all three felony counts.

Seeking to reverse his convictions, White raises five issues: (1) closed-circuit testimony by two child witnesses violated his right to confrontation under the Iowa Constitution; (2) the State did not prove that he caused the child's injuries or had custody when they were inflicted; (3) the district court erred by denying his request for a jury instruction approved in civil cases; (4) the court abused its discretion by not clarifying the marshalling instructions in response to a jury question; and (5) the court erred in finding he had the reasonable ability to pay over $10,000 in category "B" restitution. Finding no constitutional violation, substantial evidence to support the verdicts, and proper instructions for the jury, we affirm his convictions. We also uphold the restitution order.

## I.    Facts and Prior Proceedings

As part of her duties in D.C.'s ongoing child-welfare case, service provider Linda Diekevers dropped by his home one morning in early May 2020 to check on the toddler. D.C. and his mother, Donna Reisdorfer, lived with White and his two sons—eight-year-old J.W. and ten-year-old M.W.[1] White answered the door. He denied Diekevers entry, claiming that the children were all napping. When she

---

[1] Donna's teenaged son also lived with them, but she took him to stay with his grandmother in North Dakota a few days earlier.

returned that afternoon, D.C. was sitting at the table. Even from a distance, Diekevers could see bruising on the child's face. As she drew closer, she could distinguish "yellow and gray bruises as well as the red ones [she] had noticed from across the room." She testified that in her sixteen years of social work she had "never seen a child whose head was beat up so much."

Later that day, Deputy Tyler Bos and child protection worker Adrian Warnke arrived at D.C.'s house. At first, Reisdorfer and White kept them outside. When Warnke insisted that they needed to see if D.C. was safe, White let them in. They found D.C. "curled up in a fetal position" on a mattress upstairs. Among the many bruises, Bos noticed what looked like a belt mark on the side of the child's face. Bos and Warnke urged Donna to seek medical attention for D.C.

At the emergency room, nurse practitioner Nicholas Vust treated D.C. Like the other professionals, Vust noted "multiple levels of bruising that had different stages of healing"—anywhere from fresh red marks to fading yellow bruises that could be five to fourteen days old. On closer assessment, Vust discovered bruises extending into the child's right ear canal. Beyond the child's head and neck area, Vust recorded bruising to D.C.'s shoulders, back, thighs, and ankles.

Reisdorfer suggested that D.C. sustained the injuries by rolling out of bed, perhaps onto a toy. But in Vust's medical opinion, that suggestion did not match the extent and severity of the bruising. Instead, the nurse practitioner believed that the timing, pattern, and sheer number of bruises pointed to child abuse.

In recalling D.C.'s condition, Vust offered this disturbing description:

> He was the right size for a [two]-year-old, but he did not walk like a [two]-year-old should walk. He did not interact with us like a [two]-year-old should interact. He liked to walk on his tiptoes which made

us question what was going on. He tiptoed around. Wouldn't—he didn't talk at all. He was very—did not like to be touched, screamed if anybody tried holding him, anything like that. He just was not a normal [two]-year-old at the time.

From the emergency room, D.C. went into the custody of the Iowa Department of Human Services. After six months in foster care, D.C. made great strides in his development. D.C. was at the hospital for physical therapy and speech therapy, when Vust observed the transformation: "[H]e ran into the hospital, smiling, laughing, talking. I believe his foster mom at the time came over, and she picked him up and she was hugging him and he was hugging her. Just a completely different kid than I saw in the ER."

Another expert agreed with Vust that D.C.'s constellation of injuries signaled that he was the victim of child abuse. Suzanne Haney, a child abuse pediatrics specialist at Children's Hospital and Medical Center in Omaha, saw D.C. about three weeks after he was placed in foster care. By that time, his bruises were healed. But after reviewing his medical records, she believed that his extensive injuries could not be explained by childhood accidents.

In October 2020, the State charged White and Reisdorfer jointly with neglect of a dependent person and four counts of child endangerment. In January 2022, the State amended the trial information to charge White separately with one count of neglect of a dependent person and two counts of child endangerment. *See* Iowa Code §§ 726.3, 726.6(1)(a), (b) (2020).

At trial, White's two sons testified by closed-circuit television. They told the jury that White was the disciplinarian in the home and would spank D.C. with his belt. The jury found White guilty as charged. The court sentenced him to

concurrent five-year terms on the child-endangerment counts to run consecutive with the ten-year term for the neglect-of-a-dependent-person count, for a total prison term not to exceed fifteen years.  The court suspended the applicable fines and surcharges.  But the court ordered him to pay nearly $11,000 in restitution.

White appeals.

## II.    Analysis

### A.  Face-to-Face Confrontation

As his opening salvo, White claims that the closed-circuit testimony of his two sons violated his right to be "confronted with the witnesses against him" as guaranteed by article I, section 10 of the Iowa Constitution.[2]  Because White invokes a constitutional provision, we review his claim de novo.  *See State v. Rogerson*, 855 N.W.2d 495, 498 (Iowa 2014).  Under that standard, we examine all the evidence anew without deference to the district court's findings.  *State v. Williams*, 972 N.W.2d 720, 724 (Iowa 2022).  The State bears the burden to show compliance with the confrontation clause.  *State v. Liggins*, 978 N.W.2d 406, 419 (Iowa 2022).

We start with the State's request under Iowa Code section 915.38(1)(a) to allow White's sons, J.W. and M.W., to testify by closed-circuit television.  The previous summer, the juvenile court terminated White's legal relationship with his sons after the State proved that he abused and neglected them.  For the criminal trial, the State moved for a protective order, alleging the accommodation was necessary to protect the boys from trauma they would experience by testifying in

---

[2] White also raised a Sixth Amendment challenge in the district court.  But he does not renew that federal constitutional claim on appeal.

the presence of their biological father.  The boys' therapist concluded that forcing M.W. to testify in front of White would cause him serious emotional distress that could impair the child's reasonable ability to communicate—the measure in section 915.38(1)(a).  M.W. told the therapist and his foster parents that he still has nightmares about his father.  The therapist had similar views on J.W.'s welfare.  She testified that it would be difficult for the younger brother to confront his father face to face.  In her professional opinion, the closed-circuit option was necessary for both boys to provide accurate and honest information in the prosecution without being further traumatized.

The district court granted the State's motion.  And the boys testified by closed-circuit television.  On appeal, White argues their testimony violated his confrontation right under the state constitution.[3]  His argument tugs on two threads running through confrontation clause precedents.  First thread: White contends that "Sixth Amendment jurisprudence is unstable" because older cases on face-to-face confrontation, like *Maryland v. Craig*, 497 U.S. 836 (1990), are undercut by *Crawford v. Washington*, 541 U.S. 36 (2004) and its progeny.  Second thread: because federal case law is "messy," White urges us to diverge from *Craig* and recognize a more robust protection under the state constitution.[4]

---

[3] The State argues that White did not preserve error.  It asserts that White's objection to the closed-circuit testimony at trial was narrower than the one he presents on appeal.  And, in the State's view, the district court did not address the broader objection.  In his reply brief, White highlights the parts of the record where trial counsel argued for "more protection" under the state constitution.  He also quotes the district court's rejection of that "stricter approach" urged by the defense.  On this record, we find error was preserved.

[4] White asked our supreme court to retain this case so that it could resolve this emerging area of constitutional law.  But the supreme court transferred the case to us.

In *Craig*, the Supreme Court found use of a one-way, closed-circuit television to obtain the testimony of a child sex-abuse victim did not violate the Confrontation Clause where the technology was "necessary to protect [the] child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate." 497 U.S. at 857. Face-to-face confrontation was not absolutely required. *Id.* at 847–48 (comparing absence of a face-to-face encounter with the admission of hearsay statements "despite the defendant's inability to confront the declarant at trial"). In *Crawford*, the Supreme Court found that a police interview of a wife's domestic abuse report could not be played at trial against the husband. 541 U.S. at 65–66. The court decided that allowing the recording, given its testimonial nature, violates the Confrontation Clause unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54.

The State ties off the loose threads. First, calling the Sixth Amendment terrain "messy" is "overstated" in the State's view. It points out that the *Crawford* majority did not mention *Craig*, much less disavow it. *See Crawford*, 541 U.S. at 38−69. The State maintains there's "no question *Craig* remains good law." Second, the State contends "the Iowa Supreme Court has recently rejected requests to apply a different standard to confrontation clause issues under the Iowa Constitution." *See In re J.C.*, 877 N.W.2d 447, 452 (Iowa 2016) (citing *State v. Kennedy*, 846 N.W.2d 517, 522 (Iowa 2014)).

Both sides make valid points. On the one hand, White is not alone in believing that "*Crawford*'s reasoning has a potentially profound impact on *Craig*."

*See* Marc C. McAllister, *The Disguised Witness and Crawford's Uneasy Tension with Craig: Bringing Uniformity to the Supreme Court's Confrontation Jurisprudence*, 58 Drake L. Rev. 481, 509 (2010). On the other hand, the State is correct that *Crawford* and *Craig* can co-exist. That's because the two cases govern distinct confrontation clause issues. *Craig* held that while the Confrontation Clause favors face-to-face confrontation, sometimes physical presence must yield to public policy considerations and the necessities of a case. 497 U.S. at 849. Meanwhile, *Crawford* held that the Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 54−55.

But here's where the tapestry unravels: *Ohio v. Roberts*, 448 U.S. 56 (1980). *Craig* relied on *Roberts*, and *Crawford* overruled *Roberts*. *Compare Craig*, 497 U.S. at 852 (comparing "assurances of reliability" for admission of hearsay with children's closed-circuit testimony), *with Crawford*, 541 U.S. at 61 (declining to leave Sixth Amendment protections to "amorphous notions of 'reliability'"). Yet courts, including our supreme court, continue to apply the test in *Craig* to questions of remote testimony. *See Rogerson*, 855 N.W.2d at 499.

Conceding some measure of messiness in the federal precedents, we consider White's invitation to go a different direction under the Iowa Constitution. Our ability to entertain that invitation depends on whether our supreme court has already provided guidance or if it is an open question. If the supreme court has

weighed in, we are precedent-bound.[5]  *State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014).  But when open questions are presented to us, as an intermediate appellate court, we have the power to decide.  *See Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 20 A.3d 468, 480 (Pa. 2011).  The State suggests that the supreme court has already spoken by "reject[ing] requests" to apply a different standard under Iowa's confrontation clause in *J.C.* and *Kennedy*.  But in neither case did the defendant argue for a particular test under the state constitution, instead, citing only case law decided under the Sixth Amendment.  *J.C.*, 877 N.W.2d at 452.  By contrast, White argues for more protection for his right to face-to-face confrontation under the state constitution.  Because our supreme court has not decided this question, we have the power to do so.  *See State v. Spates*, No. 19-0749, 2020 WL 6156739, at *5 (Iowa Ct. App. Oct. 21, 2020) ("And so this case calls on us to plow some fairly new ground.").

So on to the merits.  White contends that the closed-circuit testimony approved by Iowa Code section 915.38(1)(a) violates article I, section 10 of the Iowa Constitution.  We start with the clause's text: "In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right . . . to be confronted with the witnesses against him, . . . ."  Iowa Const. art. I, § 10.[6]  White insists that our courts have long interpreted this clause as guaranteeing an accused "the right to see the witnesses against him, face to face."

---

[5] This concept is known as vertical stare decisis.  In short, intermediate appellate courts and trial courts are bound by the decisions of their state supreme court.  *See Rice v. Rice*, 533 S.W.3d 58, 62 (Tex. Ct. App. 2017).

[6] This phrasing is much like the federal clause: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

*See State v. Reidel*, 26 Iowa 430, 437 (1869). In *Reidel*, the court held that the deposition of a notary could not be used against the defendant in a criminal prosecution because the state constitution "forbids it." *Id.*

In its response, the State does not go back to *Reidel*. Rather, it jumps ahead to *State v. Strable*, 313 N.W.2d 497, 501 (Iowa 1981). *Strable*—citing both the federal and state confrontation rights—assumed without deciding that the trial court should not have allowed a blackboard to be placed between the defendant and the sexual abuse victim during her testimony. *Id.* But the court found that any error was harmless beyond a reasonable doubt because the key purposes of the Confrontation Clause were served. Those purposes were (1) cross examination and (2) observation of the demeanor of the witness by the trier of fact. *Id.*

*Strable* was the precursor to *State v. Coy*, 397 N.W.2d 730, 734 (Iowa 1986), where our supreme court held that the defendant's federal confrontation right was not infringed by using a screen to shield child witnesses from his view. The United States Supreme Court reversed that ruling in *Coy v. Iowa,* reiterating the importance of "the irreducible literal meaning of the [confrontation clause]: 'a right to *meet face to face* all those who appear and give evidence *at trial*.'" 487 U.S. 1012, 1020–21 (1988) (cleaned up). *Coy* left for another day whether any exceptions exist to the mandate for face-to-face confrontation. *Id.* at 1021. The Court added: "the exception created by the Iowa statute, which was passed in 1985, could hardly be viewed as firmly rooted. Since there have been no individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception." *Id.*

"Another day" came two years later when the Supreme Court decided *Craig*. The *Craig* majority recognized that face-to-face confrontation "enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person." 497 U.S. at 846. But it also recognized that face-to-face confrontation was "not the *sine qua non*[7] of the confrontation right." *Id.* From there, the majority reasoned that a defendant's right to confront witnesses may be satisfied absent face-to-face confrontation when excusing the witness's physical presence is "necessary to further an important public policy" and "the reliability of the testimony is otherwise assured." 497 U.S. at 850. The court held that the Sixth Amendment did not prohibit the use of a closed-circuit television procedure where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate. *Id.* at 857.

As White emphasizes, that holding did not sit well with Justice Scalia. He believed the closed-circuit exception for child witness testimony was the "subordination of explicit constitutional text to currently favored public policy." *Id.* at 861 (Scalia, J., dissenting). In Justice Scalia's view, face-to-face confrontation was not merely a preference under the Sixth Amendment, but "a constitutional right unqualifiedly guaranteed." *Id.* at 863.

---

[7] "*Sine qua non*" translates from Latin to "without which not"—it means "[a]n indispensable condition or thing; something on which something else necessarily depends." *Sine qua non*, *Black's Law Dictionary* (11th ed. 2019).

Back to Iowa. Five years after *Craig*, our supreme court decided that the closed-circuit procedures to protect child witnesses in the state statute[8] preserved "the defendant's basic right of confrontation while protecting minor victims from the trauma which often results from testifying in a defendant's physical presence." *State v. Rupe*, 534 N.W.2d 442, 444 (Iowa 1995) (relying on *Craig* analysis). The court also rejected Rupe's claim that the district court overemphasized the child's inability to tell the truth when facing his abuser. "Had the district court ignored this feature of B.F.'s response to trauma, it would have effectively undermined one of the fundamental goals of every trial—the truthful assertion of reliable evidence." *Id.*

*Rupe* addressed only the federal right to confrontation. But we find no compelling reason in White's briefing to take a different approach under the state confrontation clause. *See Spates*, 2020 WL 6156739, at *7 n.7 (rejecting invitation to interpret impartial-jury clause of state constitution as less nuanced than Sixth Amendment). Beginning with its text, the wording of article I, section 10 does not support the absolutist guarantee to face-to-face confrontation endorsed by Justice Scalia's dissent in *Craig* and advocated by White here. Like the federal clause, article I, section 10 does not mention face-to-face or physical confrontation. Moving to case law, our supreme court's interpretation of article I, section 10 has paralleled the United States Supreme Court's interpretation of the Sixth Amendment. *See Strable*, 313 N.W.2d at 500 (describing primary aim of both

---

[8] What is now located at Iowa Code section 915.38(1)(a) was then found at Iowa Code section 910A.14 (1995).

confrontation clauses as securing the "opportunity of cross examination" not "the idle purpose of gazing upon the witness, or being gazed upon by him").

Against this backdrop, we reject White's argument that the closed-circuit procedures allowed by section 915.38(1)(a) violate Iowa's confrontation clause. The preference for face-to-face confrontation under both the federal and state clauses "must occasionally give way to considerations of public policy and the necessities of the case." *See Rogerson*, 855 N.W.2d at 499 (quoting *Craig*, 497 U.S. at 849). Here, the testimony of the children's therapist justified allowing them to testify against their father by closed-circuit television.

### B. Substantial Evidence

White also challenges the sufficiency of the State's evidence against him. We review for legal error. *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). We consider whether, when taken in the light most favorable to the State, the verdicts are supported by substantial evidence. *Id.* Evidence is substantial if it would convince a rational fact finder that White is guilty beyond a reasonable doubt. *See id.*

To address White's challenge, we start with the jury instructions. For the first count, neglect or abuse of a dependent child, the State had to prove these elements:

> 1. On or between May 2, 2020, to May 5, 2020, the defendant was the parent or person having custody of a child, D.C. . . .
> 2. D.C. was a person under the age of 14 years.
> 3. The defendant knowingly or recklessly exposed D.C. to a hazard or danger against which D.C. could not reasonably be expected to protect himself.

The court also instructed the jury that the definition of "custody" in the first element was not limited to legal custody. It also means "to hold the responsibility to care for that individual." *See State v. Johnson*, 528 N.W.2d 638, 642 (Iowa 1995) ("It is the manifest intent of the legislature to hold section 726.3 applicable to all situations in which one individual may be charged with the care and control of another."). White contests the State's proof that he was responsible for D.C.'s care. He acknowledges living with Reisdorfer and D.C. But he points to a dearth of testimony that he was charged with the child's care. But as the State notes, the evidence showed that Reisdorfer left D.C. with White when she drove her older son to North Dakota. The State also presented testimony that White was the adult in the home who meted out physical punishment to D.C. And state social workers were supervising White's relationship with the child. In fact, White dictated their access to D.C. when they stopped by to check on him. All told, the State's proof was sufficient to show White took responsibility for D.C.'s care.

For the second count, the State had to prove these elements:

1. On or about May 2, 2020, to May 5, 2020, the defendant was the parent, guardian, or person having custody or control of D.C. or a member of the household in which D.C. resided.
2. D.C. was under the age of 14 years.
3. The defendant acted with knowledge that he was creating a substantial risk to D.C. physical health or safety.
4. The defendant's act resulted in bodily injury to D.C.

Similarly, for the third count, the State had to prove these elements:

1. On or about May 2, 2020, to May 5, 2020, the defendant was the parent, guardian, or person having custody or control of D.C. or a member of the household in which D.C. resided.
2. D.C. was under the age of 14 years.
3. The defendant intentionally committed an act or series of acts which used unreasonable force, torture, or cruelty that resulted in physical injury to D.C.

4. The defendant's act resulted in bodily injury to D.C.

White contends the State's proof fell short on the third and fourth elements of both child-endangerment counts. In short, he claims the State presented insufficient evidence that he was the person who harmed D.C. White points out: "There was no eyewitness to D.C.'s injuries. D.C. himself did not testify."

But viewing the evidence in the light most favorable to the State, we find sufficient proof that White inflicted D.C.'s injuries. First, it is common for physical abuse to occur behind closed doors. *See J.C.*, 877 N.W.2d at 459 (noting absence of eyewitnesses in many child-abuse cases). Second, testimony would not be expected from a two-year-old victim. *See id.* at 456 (noting very young children may not be competent to testify). Still, the circumstantial evidence was substantial. *See State v. Ernst*, 954 N.W.2d 50, 59 (Iowa 2021) ("Juries must necessarily make inferences when finding facts based on circumstantial evidence.").

On this record, the jury was free to consider White's reluctance to allow the social worker to check on D.C. Investigators testified that when they did see the child, an injury to his face "looked like a belt mark." While executing a search warrant, they found a belt belonging to White that "closely resembled" the markings on the child's face.

And not only did White own the belt, he was the one who used it, according to his son. J.W. testified that White spanked D.C. with his belt. J.W. recalled White taking D.C. upstairs to the bedroom to punish him and, from downstairs, J.W. could hear the child crying out: "He screamed pretty loud." J.W. also testified that

Reisdorfer "never spanks."[9]  M.W. shared similar memories of D.C. "crying out loud" from upstairs and White sounding "mad."  M.W. recalled hearing a "big thud" when D.C. was taking a nap and then seeing bruising on D.C.'s face.  M.W. thought D.C. fell out of bed.  And that was the explanation that Reisdorfer ventured for the injuries.  But the child's bed was a mattress on the floor, and medical professionals testified that the number, location, and pattern of D.C.'s injuries contradicted that explanation.  Viewing the circumstantial evidence as a whole, a reasonable jury could believe that White inflicted D.C.'s injuries.

### C. Proposed Jury Instruction

Beyond his sufficiency argument addressing D.C.'s injuries, White alleges that the district court should have given this jury instruction: "The mere fact that a person suffered an injury does not mean a party committed a crime."  White borrowed the proposed language from Iowa Civil Jury Instruction 700.8:

> **Accident Does Not Constitute or Raise Presumption of Negligence.**  The mere fact an accident occurred or a party was injured does not mean a party was [negligent] [at fault].

At trial, White's counsel argued the instruction was "an accurate statement of the law, more so with crimes than it is with torts."  The State objected to that instruction, asserting it was not appropriate to "basically get another version of what his defense is in the jury instructions."  The court declined to give the instruction, doubting its application outside the tort context.[10]

---

[9] Given the timing of the bruising, the State's evidence also ruled out D.C.'s biological father and older brother as the perpetrators.

[10] The parties debate the standard of review.  White urges us to review for errors at law because his proposal was a correct statement of law and not embodied in the other instructions.  *See Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).  By contrast, the State contends review is for an abuse of discretion

On appeal, White maintains that "principles of causation normally associated with civil tort litigation have a proper application in criminal cases." *See State v. Murray*, 512 N.W.2d 547, 550 (Iowa 1994). So, in his view, it was appropriate for the defense to propose this civil instruction in his criminal case. He relies on the discussion of the instruction in a medical malpractice appeal—*Smith*, 757 N.W.2d at 681. He contends that like *Smith*, where the jury "might improperly use a bad medical result to find negligence," here "a jury would be tempted to infer guilt because a young child was injured and only White was on trial to be held accountable for those injuries."

But even if we assume White's proposed instruction was an accurate statement of the law, its exclusion was not reversible error. *See State v. Coleman*, 907 N.W.2d 124, 138 (Iowa 2018) (finding reversal is required only if instructions misled the jury or the court materially misstated the law). As noted in *Smith*, the "injury is not fault" instruction "tends to state an obvious proposition." *Id.* And other instructions conveyed the same message to White's jury. For instance, the court instructed that White's plea of not guilty placed the burden on the State to prove guilt beyond a reasonable doubt.

The court also instructed that he was presumed innocent. It told the jurors: "This presumption of innocence requires you to put aside all suspicion that might arise from the arrest, charge, or the present situation of the defendant." The court

---

because the proposed instruction was neither required nor prohibited by law. *See State v. Plain*, 898 N.W.2d 801, 816 (Iowa 2017) (carving out exception to *Alcala* standard for "cautionary instructions"). Finding White's proposed instruction was more than cautionary, we review for the correction of legal error. *See Smith v. Koslow*, 757 N.W.2d 677, 679 (Iowa 2008), *overruled on other grounds by Alcala.*, 880 N.W.2d at 708 n.3.

admonished the jurors not to be influenced by their sympathies or emotions. Finally, the court instructed the jurors: "To commit a crime a person must intend to do an act which is against the law. While it is not necessary that a person knows the act is against the law, it is necessary that the person was aware he was doing the act and he did it voluntarily, not by mistake or accident." When considered as a whole, the instructions fairly and accurately conveyed to the jury that D.C.'s injuries alone did not prove that White committed a crime.

### D. Response to Jury Question

White next contends that the district court abused its discretion by failing to clarify the child-endangerment instructions in response to a jury question. During their deliberations, the jurors sent the court this note:



Here's the element referenced: "3. The defendant intentionally committed an act or series of acts which used unreasonable force, torture, or cruelty that resulted in physical injury to D.C." *See* Iowa Code § 726.6(1)(b).

After receiving the note, the court conferenced with the attorneys. The prosecution insisted: "We can't supplement and start giving new instructions. The instructions are what they are." Defense counsel disagreed and asked the court

to clarify for the jurors that the element required a "volitional act." He urged, "inaction does not qualify. It must be action." The court directed the jurors to "re-read the instruction."

On appeal, White first attacks the State's absolutist position that no other instructions were possible. No doubt, "the court may, at the request of the jury, give further instructions, since the interest of justice requires that the jury have a full understanding of the case." *State v. Martens*, 569 N.W.2d 482, 485 (Iowa 1997). But the question remains whether the court abused its discretion in declining to give a clarifying instruction in response to the jury's question. *See State v. McCall*, 754 N.W.2d 868, 872 (Iowa Ct. App. 2008).

On that substantive question, White argues the court should have disabused the jury of the notion that "not bringing the child in" (presumably for medical care) amounted to an intentional act as required for count three, child endangerment under section 726.6(1)(b). He reasons: "While that may have satisfied count II, which charged White with acting 'with knowledge that he was creating a substantial risk to D.C.'s physical health or safety,' it did not satisfy the element of count III requiring him to have 'intentionally committed an act or series of acts which used unreasonable force, torture, or cruelty that resulted in physical injury to D.C.'"

We need not embrace White's position that failure to provide medical care for a child could never be an intentional act that used cruelty resulting in physical injury. *See State v. Arends*, No. 03-0420, 2004 WL 1159730, at *3 (Iowa Ct. App. May 26, 2004) (noting that Iowa Code section 702.2 defines "act" to include "a failure to do any act which the law requires one to perform."). Rather, we find the

court properly exercised its authority in directing the jury to re-read the marshalling instruction.  *See State v. Wissing*, 528 N.W.2d 561, 565 (Iowa 1995) (finding no abuse of discretion regarding the district court's decision not to define an instruction that was a correct statement of the law).  White is not entitled to relief on this claim.

### E.  Reasonable Ability to Pay Restitution

In his final issue, White contests the order requiring him to pay nearly $11,000 in "category B" restitution.[11]  That category of restitution is subject to an offender's reasonable ability to pay.  Iowa Code § 910.2A; *State v. West Vangen*, 975 N.W.2d 344, 353 (Iowa 2022).  White contends the court abused its discretion in assessing his financial condition.[12]

Not so fast, says the State.  It argues that because White did not file a financial affidavit, as required by Iowa Code section 910.2A(2)(b), he waived any challenge to his reasonable ability to pay.  In reply, White argues that the district court's act of questioning him under oath at the sentencing hearing "was the

---

[11] Iowa Code section 910.1(2) defines category "B" restitution, which includes court-appointed attorney fees and court costs.  These costs stand in contrast to category "A" restitution (fines, penalties, and surcharges) and pecuniary damages (crime victim restitution).  Iowa Code § 910.1(1), (6).

[12] Again, the parties debate the standard of review.  The State argues review is for legal error because our "sole task" is to decide whether the restitution order lacks evidentiary support or misapplies the law.  *See State v. DeLong*, 943 N.W.2d 600, 604 (Iowa 2020).  For his part, White asserts that we review reasonable-ability-to-pay determinations for an abuse of discretion.  *See* Iowa Code § 910.2A(5) (presuming proper exercise of discretion); *State v. Hawk*, 952 N.W.2d 314, 320 (Iowa 2020).  Both parties are correct.  We review restitution orders for the correction of errors at law.  *State v. Klawonn*, 688 N.W.2d 271, 274 (Iowa 2004).  But "[b]ecause restitution issues implicate the sentencing court's discretion, a defendant is entitled to have it exercised."  *State v. Mai*, 572 N.W.2d 168, 171 (Iowa Ct. App. 1997).

equivalent of signing a financial affidavit." He adds that the State did not object to substituting in-person testimony for an affidavit. Nor did it take a position on his reasonable ability to pay. Because the State did not raise a challenge under section 910.2A(2)(b) in the district court, it cannot do so here. *See DeVoss v. State*, 648 N.W.2d 56, 63 (Iowa 2002) ("[O]ne party should not ambush another by raising issues on appeal, which that party did not raise in the district court."). So, we reject the State's claim that White waived his reasonable-ability-to-pay challenge and turn to the merits.

By statute, the district court started with the presumption that White had the reasonable ability to make payments toward the full amount of category "B" restitution. *See* Iowa Code § 910.2A(1). The legislature placed the burden on White to rebut that presumption. *See id.* § 910.2A(2)(a). At the sentencing hearing, the court placed White under oath and asked him questions about his financial status. The court confirmed that White had his general equivalency diploma, a job, and a history of steady employment. White had no current disability. His only outstanding debt was $3000 in back child support. His monthly child support payments of $269 were deducted from his paycheck. After hearing that evidence, the court expressed concern that White was behind in his child support payments. But overall, the court was optimistic that White could afford to make restitution payments:

> [B]ased on your representations and based on what I've seen in the [presentence investigation], you have been able to maintain and obtain full-time employment. Like I said, don't have a crystal ball and neither do you. But I would assume that upon your release from prison, you will be able to seek full-time employment. And I would encourage you to do so. It will probably be a term of your release of some sort pending something that we can't predict.

The court then decided that White had the reasonable ability to pay "not more than $10,000 of court-appointed attorney fees. And you'll be ordered to pay the rest of the category B restitution that would be the court reporter fees and the court costs."

White seeks to vacate that restitution order. He maintains that the district court abused its discretion deciding he had the resources to repay $10,000 in court-appointed attorney fees, plus court costs, which amounted to $880.75. White acknowledges the court considered his potential income after prison and his child-support obligation. But he contends the court failed to factor in the expenses he faced in providing for his "basic human needs such as food, shelter, and clothing." *See Hawk*, 952 N.W.2d at 321.

The State defends the thoroughness of the court's restitution analysis. It also points out that White presented no evidence to rebut the statutory presumption that he could make payments toward the capped attorney fees and court costs. We agree that White did not meet his burden under section 910.2A(2)(a) and affirm the restitution order.

**AFFIRMED.**